**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN TEXAS**

FILED

DEC 27 2024

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY

JENNIFER VETRANO,

                          Plaintiff,

    v.

JOHN BRDA,
ALLISON CHRISTILAW, MBA, ICD.D B,
JOHN R. HARDING, UZI SASSON,
DAN EATON ESQ, MAURICE GUITTON,
ERIC M. LESLIE, PHILIPPE MORALI,
KEN HANNAH, STEEN KARSBO,
JOHN DOES 1-20, JANE DOES 1-20

                          Defendants.

Case No.:  7:24-CV-325

**COMPLAINT FOR
VIOLATIONS OF THE
FEDERAL SECURITIES
LAWS**

JURY TRIAL DEMANDED

## I. INTRODUCTION

1. This case arises from a pervasive scheme of market manipulation, fraudulent statements, breaches of fiduciary duty, that collectively have had a significant negative financial and emotional harm on over sixty-five thousand shareholders via pump and dump schemes by specific executives.  Another group of individuals, social media influencers have steered shareholders to buy, sell or hold their shares at a specific entity, and has acted as a proxies for Nextbridge Hydrocarbons, Greg McCabe and John Brda. Many of these social media influencers have had non-disclosure agreements (NDAs) and used cyberbullying systematically to steer shareholders away from legal action to hold responsible parties accountable and gain discovery. The Plaintiff, Jennifer Vetrano, a retail investor and Associate Manager of Major Accounts in

Biotechnology, brings this action to hold the Defendants accountable for these practices that have caused financial and emotional suffering to over sixty-five thousand shareholders.

**SUMMARY**

2. John Brda engaged in a fraudulent scheme to manipulate the price of Torchlight Energy Resources, Inc. ("Torchlight") stock and sell Torchlight stock to investors at inflated prices. John Brda's scheme artificially inflated the price of Torchlight stock in June 2021, causing the price to increase by over 200% in a single week. He capitalized on his scheme by causing Torchlight to conduct an at-the-market offering ("ATM Offering") at the peak of their price manipulation, selling 16.2 million shares at inflated prices.

3. Brda, as CEO of Torchlight, first devised the scheme in early 2020 in response to Torchlight's deteriorating financial condition. Torchlight's stock was trading below $1.00 per share at the time, and Torchlight needed capital to pay its significant debt obligations and to fund ongoing drilling expenses of its oil and gas assets. Brda hatched a plan to artificially inflate the price of Torchlight's stock and raise capital by selling Torchlight shares at inflated prices.

4. To accomplish his plan, Brda devised a series of transactions intended to create a short squeeze. Those transactions included a merger agreement between Torchlight and another company, along with a dividend—in the form of preferred stock issued to shareholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange ("Preferred Dividend"). Shareholders who received the Preferred Dividend would

purportedly be entitled to receive the net proceeds of the sale of Torchlight's oil and gas assets.

Brda believed, and intended to lead investors to believe, that the Preferred Dividend would force

short sellers to exit their positions and trigger a short squeeze that would inflate the price of

Torchlight's publicly traded stock.

5.  As the first step in his plan, Brda sought a suitable merger partner. He found that

partner in Palikaras, the CEO of Metamaterial, Inc. ("Meta I"). Brda told Palikaras about the

scheme at the outset of negotiations. Palikaras fully embraced and participated in the scheme.

6.  Brda and Palikaras initially believed that merely announcing the Preferred

Dividend in a press release accompanying the merger's announcement would cause a short

squeeze and a resulting surge in Torchlight's stock price. But when the market did not appear to

immediately react following that announcement, these executives took further action and

deceptively promoted the Preferred Dividend in hopes of spreading their short squeeze narrative

and, consequently, increasing Torchlight's stock price. They did so through, among other means,

private communications with select investors and third-party consultants, who they intended to

spread the message for them. Without publicly revealing that they were the source of the short

squeeze narrative or fully disclosing their intent or plan, they intended their deceptive

promotional efforts to artificially inflate the price of Torchlight stock by: (i) causing short sellers

to exit their short positions, and (ii) enticing other investors to acquire or hold Torchlight stock.

7.  As part of their scheme, the executives also made false and misleading statements

and omissions to investors about the Preferred Dividend to further inflate the value of Torchlight stock. In Torchlight's public filings and proxy statements, Brda made false and misleading statements and omissions that were intended to create the false impression that Torchlight's oil and gas assets would be quickly monetized and distributed to Preferred Dividend holders within six months of the merger, when in fact there were no prospects of that happening.

8.  Brda succeeded in their aim to manipulate the price of Torchlight stock in the days leading up to the merger closing. Before the merger was announced, Torchlight stock was trading below $1.00 per share. As a result of the executives' scheme, Torchlight's stock price sharply rose during a ten-day period—between June 14–24, 2021—from $3.58 per share to as high as $10.88 per share before dropping back to $4.95 per share by June 25, 2021.

9.  When Torchlight's stock price began to surge, Brda wrote Palikaras: "We have two days to take advantage of the squeeze[.]" (emphasis added). Between June 18–24, 2021, Brda caused Torchlight to sell off-the-shelf shares into the public markets in an ATM Offering. Over the five-day ATM Offering, Torchlight sold 16.2 million shares to investors at an average price of $8.50 per share. In total, the ATM Offering raised $137.5 million from investors. These proceeds primarily benefitted the company that resulted from the Torchlight-Meta I merger— Meta Materials, Inc. ("Meta II")—which appointed Palikaras as CEO. And for his part, Brda demanded and received a $1.5 million bonus.

10.  By engaging in the acts and conduct alleged herein, they violated Section

17(a) of the Securities Act of 1933 ("Securities Act") and Sections 10(b) and 14(a) of the

Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5 and 14a-9 thereunder. Brda

also aided and abetted Meta II's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the

Exchange Act and Rules 12b-20 and 13a-11 thereunder.

 (1-9 Summary-Case 1:24-cv-04806 Securities and Exchange Commission v. John Brda,

Georgios Palikaris)

11.  In June 2021, Meta Materials, Inc. (Meta II) raised $137.5 million in an at-the-market

offering (the "ATM Offering"). Leading up to the offering and in connection with a merger, a

Meta Materials executive engaged in a scheme to inflate the price of its stock and defraud

investors through numerous material misstatements and omissions about the potential value of a

stock dividend to be issued as part of the merger. As a result of its fraudulent conduct, Meta

Materials sold 16.2 million shares during its ATM Offering for tens of millions of dollars more

than it could have absent its efforts to inflate its stock price.

12.  Meta Materials, Inc. (Meta II) artificially inflated the value of its common stock by

structuring a merger between its predecessor entities (Torchlight Energy Resources and

Metamaterial Inc.) to include an unregistered preferred stock dividend that would not be

immediately publicly tradeable (the "Preferred Dividend"), specifically designed to cause a

"short squeeze." Meta Materials, Inc. (Meta II)  privately and selectively disseminated—through

paid consultants, private conversations with investors, and via social-media messages—the

theory that the Preferred Dividend would cause a short squeeze by forcing short-sellers in

Respondent's stock to cover their positions before Torchlight issued the Preferred Dividend or

risk violating their short contracts by having difficulty delivering the Preferred Dividend when

the merger closed. But the company never disclosed in its public filings its intent to cause a short squeeze, and it waited until the last minute to announce the ATM Offering to capitalize on what Meta Materials believed would be a short-term price inflation of its stock.

13. In support of its scheme, Meta Materials, Inc. (Meta II) made false and misleading statements about the Preferred Dividend, which entitled its holders to receive the net proceeds of the sale of Respondent's oil and gas assets. In its public filings, Meta Materials, Inc. (Meta II) misrepresented the status of its efforts to market and sell those assets while concealing a planned spin-off of the assets into a new entity. Further, in May 2021, Respondent's incoming Chief Executive Officer baselessly claimed that the value of the Preferred Dividend could be between $1 and $20 per share when, in fact, a valuation study by Meta Materials, Inc. (Meta II)'s investment bankers only supported a per-share value range of $0.03 to $0.83.

14. Meta Materials, Inc. (Meta II)'s scheme occurred against the backdrop of a lax internal control environment. Respondent failed to devise and maintain internal accounting controls and make and keep adequate books and records by failing to account properly for the disposition of corporate assets or the recognition of legitimate expenses related to a series of payments made to stock promoters who rendered services to the company without any documentation. In addition, Respondent paid consulting fees designed to conceal the recruitment and compensation of a team. of individuals that were retained to spin-off Respondent's oil and gas assets into a new entity at the same time that Meta Materials touted in its public statements its intention to make efforts to sell the oil and gas assets and distribute the net proceeds to Preferred Dividend holders.

*10-13 United States of America before the Securities and Exchange Commission Administrative Proceedings File No. 3-21976

15. The Non-Voting Series A Preferred Shares of Meta Materials, Inc. (MMTLP), which were issued as part of a corporate spin-off intended to provide private ownership in Next Bridge Hydrocarbons, Inc. (NBH). Instead of facilitating an orderly transition to private ownership, market participants, including broker-dealers, market makers, and transfer agents, engaged in manipulative practices such as synthetic share creation and naked short selling. These actions flooded the market with counterfeit shares, suppressed legitimate share prices, and deprived shareholders, including the Plaintiff, of the fair value of their investments. Regulatory bodies, including FINRA, the SEC, and the DTCC, failed to fulfill their statutory oversight duties, enabling these abuses to persist unchecked.

16. A defining moment occurred on December 9, 2022, when FINRA issued a U3 trading halt on MMTLP shares, citing an undefined "extraordinary event." This unilateral and indefinite halt froze all trading activity, leaving tens of thousands of investors, including the Plaintiff, unable to access their assets, reconcile their positions, or trade their shares.

17. The SEC, tasked with overseeing FINRA and ensuring market integrity, neglected its statutory duties by allowing the U3 halt to persist and failing to investigate widespread irregularities. The DTCC, responsible for clearing and settlement, permitted unresolved failures to deliver (FTDs) and synthetic shares to proliferate. Together, these regulatory failures enabled institutional participants to manipulate the market and profit at the expense of retail investors, including the Plaintiff.

18. Broker-dealers and market makers, including GTS Securities and Canaccord Genuity, further contributed to the harm by engaging in manipulative practices designed to suppress the price of MMTLP shares. These entities exploited regulatory loopholes to create and trade synthetic shares, artificially inflating supply while profiting from the resulting market instability.

Transfer agents, such as AST/EQ, failed to reconcile legitimate share ownership during the MMTLP-to-NBH transition, compounding investor harm and creating prolonged financial uncertainty.

19. Corporate leadership at Torchlight Energy Resources and Next Bridge Hydrocarbons also played a significant role in enabling these systemic failures. Executives, including Greg McCabe, John Brda, and Clifton DuBose, failed to address share discrepancies, trading irregularities, and systemic market manipulation. Instead, they misrepresented the financial prospects of key assets, such as the Orogrande Basin, and neglected their fiduciary duties to shareholders, including the Plaintiff.

20. The U3 halt occurred on December 9, 2022 and to date, the Defendants have taken no meaningful steps to resolve these systemic failures or mitigate the harm caused to retail investors. Shareholders, including the Plaintiff, remain in financial and legal limbo, unable to trade their positions, reconcile their holdings, or recover the fair value of their investments. This prolonged inaction underscores critical vulnerabilities in the existing regulatory framework and highlights the urgent need for judicial intervention.

21. The disparity between the regulatory response to the MMTLP case and other market disruptions, such as the GameStop trading episode, illustrates the inequities faced by retail investors. While GameStop shareholders benefited from swift regulatory and Congressional action, MMTLP investors have endured prolonged neglect.

22. Through this action, the Plaintiffs seek to hold the Defendant (Executives) accountable for their roles in breaches of fiduciary duty. The Plaintiff requests compensatory and punitive damages to redress the financial and emotional harm they have suffered.

23. Equally important are the social media influencers that are believed to be compensated and possess non-disclosure agreements. These social media influencers act as proxies for Nextbridge Hydrocarbons or specific Executives in order to distract other shareholders from seeking legal action with the goal of discovery.

24. John Brda engaged in private communications with select social media influencers.

25. Social media influencers in the stock community have cyberbullied, cyberstalked or harassed the plaintiff and other shareholders. Threats have been personally made to the plaintiff, her position as Associate Manager of Major Accounts, and to interfere with any legal action by threatening to defame her in front of the Judge.

26. This is an action for damages and injunctive relief arising from violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

## II.    JURISDICTION AND VENUE

27. This Court has jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa).

28. Diversity jurisdiction is also proper under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the Plaintiffs, a resident of New Jersey, and Defendants, whose principal places of business are located in other states, including but not limited to Texas, New York, and Washington, D.C.

29. Venue is appropriate in the United States District Court for the Western District of Texas under 28 U.S.C. § 1391(b) because the plaintiff is an owner of Nextbridge Hydrocarbon stock

and Nextbridge Hydrocarbons is headquartered and conducts substantial business within this District, and a substantial part of the events or omissions giving rise to the claims occurred within this jurisdiction. The SEC case involving John Brda case 1:24-cv-04806-KPF was moved from the United States District Court Southern District of New York to United States District Court for the Eastern District of Texas.

## Plaintiff

30. Plaintiff: JENNIFER VETRANO (hereinafter referred to as "Plaintiffs" or "Vetrano") has at all times mentioned herein been a resident and citizen of the Town of West Creek, in the County of Ocean, in the State of New Jersey. She is an Associate Manager of Major Accounts in Biotechnology and shareholder of NextBridge Hydrocarbons.

## Defendants

31. Defendant, JOHN BRDA: John Brda (hereinafter "Brda") is the former Chief Executive Officer of Torchlight Energy Resources ("Torchlight" or "TRCH"). resides in St. Louis, Missouri. Brda served as Torchlight's CEO from 2014 through its merger with Meta I on June 28, 2021. Post-merger, Brda held a consulting role with Meta II through late 2022. Torchlight's last known address is 5700 W. Plano Parkway, Suite 3600, Plano, Texas, 75093. According to online information, Brda resides at 1425 Frontenay Court, Saint Louis, MO 63122.

32. Defendant ALLISON CHRISTILAW, MBA, ICD.D B (hereinafter "Christilaw') served as HRCC Chair of Meta Materials from March 2020 to August 2024. According to Linkedin Christilaw is located in the greater Toronto Area, Canada.

33. Defendant DAN EATON, ESQ (hereinafter "Eaton") serves as the Chief Legal Officer of Meta Materials. Eaton last know address was 5880 W. Las Positas Blvd. Suite 37, Pleasnton, CA 94588.

34. Defendant MAURICE GUITTON ("hereinafter Guitton") serves on Meta Materials board of Directors as an Audit Committee member. Guitton is located in Canada.

35. Defendant ERIC M. LESLIE ("hereinafter Leslie") serves on Meta Materials board of Directors as an Audit Committee member.

36. Defendant PHILIPPE MORALI ('hereinafter Morali") serves as a member of the Audit Committee and the Compensation Committee at Meta Materials.

37. Defendant KEN HANNAH ("hereinafter Hannah") serves as the Chair of the Audit Committee for Meta Materials and has been determined by the Board to be an audit committee financial expert.

38. Defendant STEEN KARSBO ("hereinafter Karsbo") serves on the Board of Directors for Meta Materials.

39. Defendant JOHN R. HARDING (hereinafter "Harding") was appointed as Chair of the Board of Directors for Meta Materials Inc., effective August 16, 2022.

40. Defendant UZI SASSON (hereinafter "Sasson") served as Meta Material Inc.'s CFO and Chief Operating Officer since April 2023. Sasson was appointed to CEO in November 2023 after Jim Fusaro resigned from Meta Materials Inc. due to "unexpected health issues."

41. JOHN DOES 1-20

42. JANE DOES 1-20

## STATEMENTS OF FACTS

### Torchlight

43. From 2010 to 2020, TRCH traded a cumulative total of 745 million shares on public markets. This substantial trading volume reflected its decade-long activity in the oil exploration sector and positioned it for the eventual merger with META I. In the 1st half of 2021 leading to the June 28, 2021 merger, Torchlight traded over 3.6 billion shares. The trading history highlights the scale of its operations and shareholder engagement during this period.

44. On March 1, 2020, Torchlight presented an Investor Presentation via PowerPoint or email to interested parties, emphasizing the company's focus on assets in the Permian Basin, notably the Orogrande, Hazel, and Winkler projects.

45. They announced that a third-party reserve estimate indicated a mean case of approximately 3.678 billion barrels of oil equivalent (BOE) in recoverable reserves from unconventional zones in the Orogrande Basin. This estimate was based on a petrophysical report prepared by Stimulation Petrophysics Consulting.

46. Based on Brda and McCabe's stated 'probable reserve' of 3.678 billion barrels of oil at the Orogrande site and the 2019 average price of West Texas Intermediate (WTI) crude oil at $56.99 per barrel, the perceived above-ground value of the asset was approximately $209.51 billion.

47. Using industry-standard valuations of 10–20% of the market price for oil in the ground, the below-ground value ranged from approximately $20.96 billion to $41.92 billion, reflecting the potential fair market value prior to extraction.

48. These statements, from NBH corporate officers and social media influencers regarding the probable reserve inferred great expectations regarding NBH's financial prospects and were referenced consistently in shareholder discussions leading up to the MMTLP transition.

49. The Orogrande Project was identified as the flagship asset, comprising over 134,000 acres with a substantial recoverable resource potential estimated at 3.7 billion barrels of oil equivalent in the median case.

50. The presentation underscored the project's potential to attract major industry players for acquisitions or partnerships due to its size and resource estimates. While acknowledging market risks, the company highlighted its belief in the presence of oil, framing the central question as not whether oil exists but determining the exact quantity recoverable.

51. In June 2020, Brda, along with the members of Torchlight's board of directors, resolved to pursue a strategic initiative aimed at salvaging the company through a merger with META I, a corporation focused on advanced technological innovations and cleantech solutions.

52. This merger was presented to shareholders as a critical measure to stabilize the company, with claims that it was necessitated by the pressing need to address an overwhelming number of illegal short shares allegedly created in the market.

53. These naked short positions were portrayed online as a significant threat to Torchlight's financial stability, further justifying the urgency and strategic importance of the merger.

54. Shareholders, or potential buyers, were led to believe that this merger would provide a pathway to resolve the systemic challenges posed by these illegal short shares (short squeeze) while transitioning the company toward a future in high-tech innovation.

55. On December 14, 2020, Torchlight, a Texas-based oil exploration company, initiated a merger plan with META I, a Canada-based high-technology materials firm.

**Meta II**

56. The merger aimed to combine TRCH's oil and gas assets with MMAT's advanced materials technology to enhance shareholder value and diversify operations. This corporate action marked a pivotal shift for both companies, setting the foundation for the creation of META II.

57. Torchlight initially issued Preferred Stock, later known as MMTLP, as restricted shares. However, these shares began trading on OTC markets (on October 06, 2021), implying a conversion to free-trading status. The process of converting restricted shares into free-trading shares typically requires either a registration statement declared effective by the SEC or an exemption, such as Rule 144 or a 3(10)(a) exemption.

58. It is believed that the document related to the shares' issuance, suggests that Brda or other corporate officers may have intentionally structured the issuance to leave room for the shares to trade on the OTC markets after the fact, despite public assurances that the shares would not be traded.

59. Further verification through Canadian or American court records, would be required to establish, if a 'fairness hearing' may have been conducted, and is necessary to confirm whether this process complied with regulatory requirements.

60. This discrepancy raises serious questions about transparency, corporate intent, and the overall integrity of the MMTLP trading process, directly impacting shareholder trust and financial outcomes.

61. Also, on or around Q4 of 2020, another ticker symbol called MMATF started trading on various exchanges both in the US and internationally.

62. This MMATF ticker, by all accounts, was also representative and duplicate of META I which was at the time trading on the Canadian junior exchange The CSE under the symbol MMAT.CN and was not DTC eligible.

63. From January 1, 2021, to June 25, 2021, TRCH traded a total of 3.6 billion shares. This unprecedented trading volume occurred over just six months, a significant increase compared to the company's cumulative trading volume of 745 million shares recorded over the prior decade, raising concerns about unusual trading activity.

64. Based on the extreme volatility and anomalous trading volumes observed during the first six months of 2021, there are credible concerns that naked short positions may have been introduced in TRCH. A detailed investigation into trading activity during this period, particularly involving GTS Securities, is necessary to determine whether improper trading practices, such as naked short selling, occurred.

65. In June 2021, GTS, under the direction of Ari Rubenstein, and Canaccord Genuity, a Canadian market maker, jointly filed paperwork to register the "Series A Preferred Stock" for trading on the Over-The-Counter (OTC) market for NASDAQ, without the authorization or permission of META I or Torchlight executives.

66. Importantly, Rubenstein writes, that there is room to reduce the burden of Rule 15c2-11 by expanding the criteria for the types of securities which would be eligible for exemption from the rule, allowing market makers to quote immediately without diminishing investor protections.

67. This means that preferred stocks are being categorized as part of derivative securities eligible for exemption from Rule 15c2-11, provided that their associated primary shares are listed on a U.S. securities exchange.

68. There are shareholder concerns that GTS and Canaccord relied on outdated, decade-old information in their Form 211 filings to facilitate the tradability of MMTLP shares. If verified, this reliance may constitute a violation of FINRA rules and warrants further investigation into the accuracy and validity of these filings. Additionally, it is possible that no Form 211 filings were submitted at all, as the SEC had no record of such filings as of August 16, 2021.

69. In a letter dated June 21, 2021, the OCC explicitly stated that the "Series A Preferred Shares" would not trade.

70. However, that letter informed options traders that they were not required to close out short positions through the merger until what would become "MMTLP" could trade on the OTC market. This directive directly contradicted the public intentions and legitimate filings of the merged companies.

71. During the merger of Torchlight and META II, John Brda, a key executive and shareholder, publicly underscored the significant potential value of the Orogrande Basin oil and gas assets. He emphasized the probable oil reserves and the presence of other unproven assets within the basin, drawing attention to its strategic importance in the merger.

72. However, public filings and disclosures at the time valued the Orogrande Basin assets at $47 million—an amount significantly lower than the estimated $20.96 billion to $41.92 billion based on the below-ground valuation of probable reserves.

73. Subsequent disclosures during the NBH spin-off brought to light notable discrepancies in these valuations, raising concerns about the accuracy and transparency of the initial assessments.

74. On June 15, 2021, John Doe 4 an influencer and consultant to Nextbridge Hydrocarbons on X, stated, "The OroGrande asset holds 3.7 billion barrels of oil. It's no joke. It's proven." He further wrote, "The special dividend will likely pay out between $10.00 and $20.00 per share. OroGrande has 3.7 billion bf reserve with oil at $70+ it's a slam dunk."  John Doe 4 also became a consultant to Nextbridge Hydrocarbons under the leadership of Greg McCabe and is currently receiving $10,000 a month for consultant fees.  It does not appear that John Doe 4 has any experience in Oil and Gas based on his Linkedin profile.

**NextBridge Hydrocarbons**

75. On June 28, 2021, MMTLP shares were created during the spin-off in which TRCH transitioned specific assets into NBH.

76. These shares, designated as "Preferred Stock Dividend," were intended to represent private ownership in NBH and were not meant to trade publicly.

77. To effectuate the spinoff, on July 14, 2022, NBH filed a registration statement on Form S-1 with the SEC, followed by several amendments and a final prospectus (collectively, the "Registration Statement"). The Registration Statement became "effective" on November 18, 2022.

78. META II post-merger did not sell the legacy Torchlight oil and gas assets and, consequently, proceeded with spinning off the oil and gas assets into NBH.

79.  On October 6, 2021, GTS Securities and Canaccord Genuity began trading MMTLP "Series A Preferred" shares publicly.

80.  Additionally, that day, META II was notified via email that the OTC Market would start trading MMTLP the same day. This was META II's first and only 'courtesy' notification of this action.

81.  This activity occurred despite directives in TRCH's proxy statement, which prohibited public trading of the Series A Preferred Shares on any exchange.

82.  On or about October 7, 2021, GTS Securities and Canaccord Genuity facilitated public trading of MMTLP shares on the OTC market. These actions were not authorized by TRCH or META II executives.

83.  According to John Brda, former CEO of Torchlight, notified OTC Markets of this unauthorized trading, OTC Markets directed him to FINRA. FINRA subsequently informed Brda that he lacked standing to bring a formal complaint, as he was no longer the CEO. This unauthorized listing initiated significant trading irregularities and confusion among investors.

84.  When Ken Rice, then the CFO of META II, contacted the OTC Markets and other regulators, the general consensus was that the trading of these shares was going to happen with or without META II's permission.

85.  On November 29, 2021, FOIA-released emails confirmed communications between FINRA and the SEC regarding MMTLP, indicating early awareness of trading activity and concern.

86. From October 7, 2021, to December 9, 2022, trading activity facilitated by GTS Securities during this period corresponded to volumes far exceeding the authorized float of MMTLP shares which, at the time, was approximately 165 million shares.

87. This pattern suggests the possibility of synthetic share creation and requires a comprehensive audit of fails-to-deliver records to confirm whether shares were properly located and settled.

88. Between October 1, 2022, and December 8, 2022, MMTLP stock experienced significant volatility, with prices ranging from a low of $2.85 to a high of $12.50.

89. During this period, the market capitalization for MMTLP, a relatively unknown oil and gas exploration company, fluctuated between approximately $1.5 million and $6.5 billion.

90. The extreme volatility and market capitalization levels observed, relative to the total authorized share count of 165 million, indicate discrepancies that warrant further examination to rule out synthetic shares, rehypothecation, or other trading irregularities.

91. Between November 15 and December 5, 2022, Brda sold approximately 300,000 shares of MMTLP. During this period, the trading price of MMTLP ranged between $2.90 and $9.90. Based on this price range, Brda's transactions generated proceeds estimated between $870,000 and $2,970,000.

92. Publicly available social media posts and recorded X/Twitterspaces from this timeframe show that Brda encouraged others to purchase MMTLP shares and denied selling any of his own shares.

93.  On October 11, 2022, Brda tweeted "This just in.  Expect some volatility this morning.  Another 550k shares borrowed.  Soon there will be none left."

94.  On October 11, 2022, Brda tweeted "With Fidelity, you have to phone it in to the fixed income desk.  You can sell online, but only buy via a phone call, last I heard."  With this direction the plaintiff called Fidelity orders in and purchased MMTLP shares.

95.  Brda sometime later acknowledged selling a portion of his holdings during the price increase leading up to the FINRA-imposed U3 halt.

96.  On November 23, 2022, MMTLP shareholders were advised to transfer their shares to the transfer agent, American Stock Transfer & Trust Company (AST), now operating as Equiniti Trust Company, to facilitate the distribution of NBH shares.

97.  This transfer was intended to streamline the corporate action and ensure shareholders received their NBH shares directly.

98.  Additionally, shareholders were informed they would receive bonus shares of NBH as an incentive for transferring their shares to AST; however, these bonus shares were never delivered, raising concerns about the representations made to shareholders.

99.  On November or around 30, 2022, Greg McCabe sold approximately 6.8 million shares of MMTLP out of his total holdings of 18,758,249 shares, which constituted 11.37% of the float.  On that date, the trading price of MMTLP ranged between a low of $7.76 and a high of $10.00.

100.  Based on this price range, McCabe's transactions generated proceeds estimated between $52,768,000 and $68,000,000. Under the U.S. Securities Exchange Act of 1934, SEC rules

regarding Beneficial Ownership Reporting and Section 16 Reporting, McCabe was required to file a Form 4 report within two days from these share transactions.

101. A series of emails obtained through a Freedom of Information Act (FOIA) request and released in redacted form indicate that individuals at both the SEC and FINRA, on December 5, 2022, including Mr. Sam Draddy, Ms. Patti Casimates, Mr. Richard Boyle, Mr. Jay Gibbons, and an unidentified redacted individual, were aware of fraudulent activities affecting the trading of META II and MMTLP shares. These emails provide insight into regulatory awareness of irregularities during the period leading up to the FINRA-imposed U3 halt.

102. This also means that FINRA Blue Sheets, formally known as Electronic Blue Sheet (EBS) data, are reports that broker-dealers submit to regulators such as FINRA and the SEC, were being used as early as this date mentioned, if not before this.

103. These reports contain detailed trade information, including the identity of the buyer and seller, trade size, trade price, and other transaction-specific details. The purpose of Blue Sheets is to assist regulators in monitoring the markets, detecting suspicious trading activity, and investigating potential securities violations like market manipulation or insider trading.

104. Blue Sheets are crucial for ensuring transparency and accountability in the financial markets, enabling regulators to reconstruct trading activity and identify patterns of misconduct.

105. On December 7, 2022, both FINRA and META II corporate leadership confirmed the existence of an approved corporate action for MMTLP. According to this action, no new trades could be executed after December 8, 2022, but shareholders could settle positions, including short position close-only trades, through the end of trading on December 12, 2022.

106. The corporate action further specified that MMTLP shares would be cancelled on December 13, 2022, with a pay date for NBH shares or dividends set for December 14, 2022.

107. On December 7, 2022, John Mendall, Vice President of OTC Markets, stated on Trader TV that MMTLP shares were approved to trade through December 12, 2022, as part of a FINRA-approved corporate action.

108. Mendall confirmed that MMTLP would no longer be available to trade on the OTC market starting December 13, 2022, and that the shares were planned to be deleted following that date.

109. Prior to December 8, 2022, FINRA did not provide any notice, either privately or publicly, that a U3 halt on MMTLP trading would be issued. FINRA failed to inform the issuer or shareholders before the halt occurred, and no explanation was provided for this omission.

110. On December 8, 2022, FINRA revised the original corporate action notice for MMTLP, altering key language and removing references to the December 14, 2022, pay date for NBH shares. These unilateral changes were made without notifying or justifying the decision to META II.

111. Also on December 8, 2022, FINRA failed to attend a scheduled meeting with the Depository Trust & Clearing Corporation (DTCC) and attorneys from META II regarding unresolved issues with the MMTLP corporate action.

112. Later that same day, FINRA issued a revised corporate action notice, altering the language to state that "the symbol will be DELETED," replacing the prior notice indicating that MMTLP shares would be "CANCELLED" upon conversion to NBH shares.

113.  This revision omitted the December 14, 2022, pay date, further confusing shareholders and creating uncertainty about the transition process.

114.  At the close of trading on December 8, 2022, deal-broker Level 2 data revealed that short position holders in MMTLP utilized the 505 code (commonly referred to as S.O.S.), signifying a heightened urgency to close their positions. The data reflected transaction prices reaching and exceeding 100 times the closing price of $2.90 per share (i.e., $290.00+), an extraordinary deviation characteristic of a severe share imbalance.

115.  Furthermore, after December 8, 2022, limit orders ranging from less than $100 to as much as $200,000 per share were submitted through various brokerages but were marked as "too late to cancel." This indicated significant irregularities in the handling of MMTLP trades, affecting more than 65,000 shareholders (Traudt v. Rubenstein, 2024, Docket No. 2:34-cv-782, U.S. District Court for the District of Vermont).

116.  Many MMTLP traders, including the Plaintiffs, have expressed their intent to execute opportunity trades prior to the trading deadline on December 12, 2022, as specified in the approved corporate action.

117.  On December 9, 2022, FINRA imposed a U3 trading halt on MMTLP shares. As a self-regulatory organization operating under delegated authority from the Securities and Exchange Commission, FINRA justified the halt by citing "extraordinary circumstances." However, this action left many investors unable to access their investments, with no clear resolution provided.

118.  On December 13, 2022 the SEC filed charges against eight individuals associated with the Atlas Trading group for their involvement in a pump-and-dump scheme, which included manipulating the stock of Torchlight Energy. The defendants, including Zack Morris (Edward

Constantin), Perry Matlock, and others, allegedly used social media platforms to promote stocks, including Torchlight, to inflate their prices before selling their shares for substantial profits. The scheme reportedly generated around $100 million in profits.   In total, the TRCH Participants' profits on TRCH from February 10 through February 23, 2021 were $288,603 for Hennessey; $336,138 for Matlock; $148,131 for Deel; and $2,757 for Knight. The case number for the SEC's complaint against the Atlas Trading group is 22-CV-221.

Pages 31-35 Civil Action No. 22-CV-221

119.  As early as 2019 John Doe 3 worked for Blackbox Stocks, a company that describes itself online as the ultimate platform for traders, offering trade execution, analysis, and community chat all in one place without switching between multiple websites.  In 2020 Blackbox announced an integration deal with Tradestation that enabled Blackbox users to trade stocks and options via Tradestation without ever leaving the Blackbox platform.  The Blackbox stocks Youtube channel had 11.6k subscribers and 121 videos.  In May of 2019, John Doe 3 was working for Blackbox and had recorded YouTube videos on the channel.  His alias was Andrew McDeggins or Mr. McDeggins.  He used the logo for the Blackbox stocks to create a very visually similar emblem on Stock twits under MrMcDeggins and on X/Twitter as @Freecommercials, @KarmaCollects and used these platforms to draw in his followers and manipulate markets pertaining to MMTLP and MMAT.  From his Stock twits profile you can see he was coordinating with John Doe 1 and retweeting John Doe 1's posts and commenting on them.  On March 13, 2022 he posted on Stock twits about "Blackboxstocks is offering the nuttiest special ever.  5 Bucks for a month.  That's insane.  If you're a Ddaytrader, you NEED to give it a shot.  You'll never want to trade without it again."  He hashtags both Blackbox stocks as well at MMTLP and MMAT tickers.  On July 11, 2022 he uses his stock twits account to say, "I haven't chimed in on this at all but wouldn't it

be HILARIOUS if everyone holding $MMTLP used their dividend payouts to SHORT $MMAT because they're all pissed off at @Palikaris & Company for stringing them along all this time? Just thinking out loud." He says on Stock twits on 12/8/22 as he retweets John Doe 1's tweet, "I too expect gap down on open to grab as many shares as they can, and for them to drive prices down as hard as possible. Then, VIOLENT swings between Fri & Monday. 5-10." This was the day before the U3 hault on MMTLP stock. He also tells his followers on Stock twits on another post that, "I just called a securities attorney that I'm close with, and even he said he has never seen anything like this before. He said he THINKS the TRCH shorts would have no choice but to cover." In the plaintiff's view this seems to allude to the fact that John Doe 3 is leading his followers to believe that the TRCH shorts covering would trigger a short squeeze of the stock. In 2023 John Doe 3 pivoted on social media to X/twitter where he created multiple accounts where he hosted over 1369 hours on X/twitterspaces according to an IT script run on X/twitter. In one tweet on or around 8/7/24, he says to Brda, "$MMTLP Hey @johnbrda based solely on actions that NBH has taken by retaining @johnnytabacco, and is currently taking by getting current, combined with what they've stated in PR's, do you believe that they have a plan to atleast attempt to deliver some kind of resolution? I do." Brda responds, "I do." In the plaintiff's view he used his various profiles on the X/twitter platform to write scripts on a narrative that would encourage his followers to write and call Congressional members and ultimately distract them from taking any legal action for MMTLP and to act as a proxy for Nextbridge Hydrocarbons and Brda.

120. Prior to the U3 halt of MMTLP JOHN DOE 1 utilized stock twits in attempt to influence the market for MMTLP. He claims to have a goal of 10 million MMTLP share and a friend with at least 7.5 million MMTLP shares. He says that these shares are not original TRCH preferred

shares and he claims to buy shares and manage 20 different MMTLP accounts for multiple companies in order for him to not be considered a 5% holder. John Doe 1 claims to have insider knowledge.

    a. Brda tweets on 2/6/23 he had a nice chat with John Doe 3 and John Doe 1. Also says, "Wanted to let everyone know all our conversations have always been straight up and helpful. Never nefarious. Likely my fault for not paying attention to this issue, super busy. Let's all just stay pos. and focus on the prize."

    b. John Doe 1 utilizes stock twits to send messages to his followers on October 12, 2021, "$MMTLP know what you own....you have preferred "A" stock not standard....there are a lot more rules and guidelines that they must adhere to...They need the preferred stock to pay the short position in full by December 2021. Hold. Hold and hold and you will be paid one way or the other."

    c. John Doe 1 utilizes stock twits to send messages to his followers on October 9, 2022, "my avg is 1.43 and my friend has 16 million shares. I call over 100 per share easy...my hedge fund inside short says theynate scared and calling for 150 to 175...can you imagine that with my share count...and what everyone holding long will make!!!! The trick is everyone is going to have to hold and not give in to weakness as their account is shooting up! Takes a lot of stamina to hold!"

    d. John Doe 1 utilizes stock twits to send a picture to his followers on February 9, 2022 of himself in front of a large plane and says, "looks like one of mine citation."

    e. John Doe 1 utilizes stock twits to send another message to his followers on March 11, 2022 that reads, "@ramensoups @chavy45 I guess the truth hurtsyou should be careful of what

you say and who you say it to and there are people in this world that have a lot of clout that can find out a lot of things that unnecessary you don't want to put out there! So but out and get off peoples back and quit spreading fud and go to another stock…Or is your way blocking me the way you deal with things…."

f. John Doe 1 utilizes stock twits on September 9, 2021 to reply to someone named @prince_of_persuasia saying "just like you called John Doe 10 full of shit too…he's my partner."

g. An account on X called @Ceopumpers doxes John Doe 1 as having a felony conviction for sexual exploitation child sell/publish on March 9, 2023.

121. Between 9/21/22-9/9/22/22 John Doe 10 utilized Stock twits to tweet the following posts;

a. "$MMTLP #2 reporting in. I will be buying a small country when this plays out. 1.58 million shares x $65=what? Stay strong. Will will be rich. Brda is the real deal. Had drinks with him in my backyard. Set your sell orders high. Stay strong. Rocket soon. Will Stuart in Cali."

b. $MMTLP I will be fighting with the shorts to buy more as the bake sale comes to an end.

c. $MMTLP this is your #2 shareholder reporting back (17.8 million shares). TD Ameritrade just stopped my ability to purchase more shares because I would not lend or sell my shares. They have been bugging me over the last few weeks to "play ball with them" by lending or selling my shares. Other fellow holders have given me a similar story. Bottom line, this tells you there are not enough shares to clear TD's books. This also explains why the limit "ask" continues to rise and is now above $350. They are doing this to understand the cost for the

shares that they need to close out shorts, if necessary. IMO do not lend out shares and do not set limit sale orders with stops or trailing stops. The stock price will start to move violently up and down in attempt to shake your confidence and grab your shares. Know what you hold. Go for the gold. This is not financial advise, just one person's opinion. Good luck to all. Stay strong."

122. Prior to the U3 halt of MMTLP JANE DOE 1 utilized Stock twits, YouTube and Twitter in attempt to influence the market for MMTLP. She claims to represent a group of people with five million share of MMTLP each. In direct messages with another influencer she also claims to have "a bunch of NDAs signed." She also says "why would this group I represent now get to meet with executives if the MMTLP they bought was fake?" She also claims that this group is not on the Meta Materials side. This influencer has made multiple videos on MMTLP and has influenced 7.17k subscribers with her marketing messages and false valuations of the Oragrande Assets.

123. John Doe 11 is the brother of product officer at Meta Materials and has a YouTube channel with 21.5k subscribers. Pre-halt on a recorded YouTube video he relays to all of his viewers, "I think the divi will be between $30-60 bucks if the price goes above $60 I may hold up until the last few moments and see how high it goes. And if it happens to go bonkers I will sell. Because if the price is at $85, $100, $600, $1000 that's more than I would get off a divi."

124. On a recorded X/twitter space after the U3 halt John Doe 12 tells listeners, "I will stand behind McCabe and push him forward. I don't care that he is shady that doesn't matter. It matters to me that I can get resolution."

125. Brda attended a recorded X space call and relayed to influencers that his former SEC attorney told him, "there is nothing good that is going to happen by you reporting any of this to

the SEC…. instead of looking at the shorts they are going to question everything you've ever done with the company."

126. Brda attended a recorded X space call and relayed to influencers that "my theory is MMTLP would've never happened had the books been fully balanced on the dividend date. So the brokerage house, the prime brokers, and the hedge funds never cleared their positions."

127. Brda attended a recorded X space call and relayed to influencers that "I think there is a decent size short in MMTLP." "What you are going to see is that, this is my personal opinion, some brokerage houses are going to deny people to be able acquire MMTLP and they are going to say just like Robinhood did, sell only… Which is going to create all kinds of problems in MMTLP when the dividend is issued."

128. Brda attended a recorded X space call and relayed to influencers that he "has started to watch the Jane Doe 1's videos, he gets distracted but one of these days I am going to watch them. Some other people have called me and recommended that I watch them."

129. Brda uses the X platform to tweet that hedgefunds used old data from TRCH to get trading started for MMTLP. "the MMTLP profile is from 2012. This smells like nefarious from people who are not good people."

130. NOBO lists (Non-Objecting Beneficial Owner) are lists of shareholders who do not object to having their identity disclosed to the company.. This allows the company to directly communicate with them. Generally, access to a NOBO list is restricted to current company employees, specifically those authorized to request it, such as officers or designated representatives. Ex-executives typically do not have the right to access this information once they have left the company.

a. Brda tweets on June 14, 2024, at 1:15 pm "$MMTLP Hearing about a bit of confusion regarding Andrew and whether or not he is a shareholder. I do see him on the nobo list in June of 22 for 9,000 shares. So that should clear it up."

b. John Doe 2 utilizes X and tweets on July 23, 2023 "I was assisting @johnbrda with European NOBO list holders' information. You can ask him directly. He will concur."

c. Brda tweets on December 30, 2023, at 4:18 pm "$MMTLP just checked the NOBO list for TradeStation on June 1, 2022. TradeStation had 396,870 shares with a NOBO registration (shareholder not objecting) to giving their info to the company on this date. The bulk certificate issued to TradeStation is below. 122,622 shares on their bulk certificate. This does not include OBO shares and certainly with six months of trading it could have changed. Just giving you info."

131. Jane Doe 2 has more than twenty times referenced that she was privy to inside information regarding Nextbridge Hydrocarbons and MMTLP and investigations, but she appeared on social media (X) after the U3 trading halt. It is the plaintiff's view that this person utilizes her X profile with over 7200 followers to host spaces influencing followers not to investigate McCabe, Brda, and other individuals associated with NBH. She advised shareholders online to transfer their shares to AST (now Equiniti) trust company and encouraged them to do it for a "share count" but then at times would attempt to distance herself from any advice after making repeated pleas for MMTLP cusip holders to transfer even at the shareholder's cost into AST. Based on an analysis of IT script data for X, space calls related to MMTLP stock, Jane Doe 2 has hosted 1108 hours and 30 minutes with thousands of listeners discussing the MMTLP fiasco and has been a stalwart defender of McCabe and Brda even after the loss of the leases to malfeasance from University Lands in October 2024 due to the failure of Nextbridge Hydrocarbons to pay royalty payments to

University Lands and the outright fraud uncovered in that the Orogrande oil fields at the heart of this litigation hold not oil.

132.  Based on an analysis of IT script data for X, space calls related to MMTLP stock totaled 10,617 hours and 50 minutes including; Jane Doe 2, Jane Doe 3, John Doe 3, John Doe 5, John Doe 6, John Doe 7.  Many influencers had hosted spaces with hundreds or thousands of people as follows; Jane Doe 1completed 1108 hours and 30 minutes discussing the MMTLP fiasco, John Doe 5 completed 722h and 1minute discussing MMTLP fiasco,  John Doe 3 completed 349 hours and 43 minutes on his first profile and 1020 hours and 7 minutes on his second profile on spaces discussing MMTLP fiasco,  Jane Doe 3 completed 332 hours and 32 minutes on spaces discussing MMTLP fiasco.

133.  A financial market expert, and X social media influencer, Dave Lauer commented on X in regards to the "MMTLP community."  He stated that "I don't understand when MMTLP became conflated with fair markets.  The MMTLP community is the most abusive, toxic online community I have ever encountered.  I have never encountered so much hate and negativity."  In a separate post on X on 6/13/24 he states, "Because the last time I tried to help MMTLP investors I received death threats and the most horrific abuse I've even been subjected to.  I tried, you folks do not want my help, and that's fine." Dave Lauer is a Market Structure and Technology Architecture Consultant. His most recent work includes public policy with Better Markets and technology architecture with IEX, a new equity market. Previously, he worked as a senior quantitative analyst at Allston Trading and Citadel Investment Group.   Dave Lauer has 191.1k followers on X/twitter.  A link to his media profile is as follows https://linktr.ee/dlauer

134. On December 9, 2022, counsel for META II and NBH contacted FINRA to seek clarification on whether the U3 halt was temporary or permanent. Despite these efforts, FINRA failed to provide a definitive response or explanation.

135. FINRA justified the trading halt with the following statement: "FINRA has determined that an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearing process for shares of MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and the public interest."

136. In the same FINRA notice announcing the halt (UPC #35-22) dated December 9, 2022, FINRA further clarified that the trading halt would remain in effect until the deletion of MMTLP, scheduled for December 13, 2022.

137. Although the U3 halt was technically lifted on December 13, 2022, the practical effect of this halt remains unresolved, as investors have not regained access to trading their shares or resolving their holdings. As of December 4, 2024, the matter remains unresolved, leaving investors without resolution for a total of 726 days.

138. Although NBH's S-1 filings and amendments were approved in 2022, position-close-only restrictions were not enforced for MMTLP shares before the U3 halt. These restrictions would have limited new short positions and helped stabilize the market during the transition.

139. On December 13, 2022, FINRA deleted the MMTLP ticker entirely from its listings through its UPC Advisory system. This action was taken as part of the corporate action for NBH, but FINRA did not provide additional details or address ongoing shareholder concerns.

140. On December 14, 2022, META II completed the spin-off of the oil and gas assets to NBH and, as a result, holders of META II's Preferred Stock received new shares in NBH pursuant to the Registration Statement (the "Spin-Off").

141. Clifton DuBose was the CEO of NBH during the transition of MMTLP shares to private shares. DuBose was positioned to facilitate the corporate transition of NBH, a process critical to addressing shareholder concerns related to the spin-off and the reconciliation of share discrepancies. He resigned this position in January of 2024.

142. Shareholders who received NBH shares as a result of the Registration Statement and Spin-Off have been damaged as a result of Defendants' violations of the Securities Act.

143. Also, on December 14, 2022, META II completed the Spin-Off and distributed NBH's equity to the Preferred Stock shareholders as of December 12, 2022 (i.e., the record date).

144. In total, META II distributed 165,472,241 shares of NBH to the Preferred Stock shareholders.

145. On January 18, 2023, Brda, former CEO of Torchlight, announced the formation of Flamethrower, a shareholders' group aimed at investigating potential market manipulation involving MMTLP stock.

146. Flamethrower was established to investigate alleged market manipulation by market makers, broker-dealers, and other parties concerning MMTLP stock, particularly focusing on the events surrounding the spin-off of NBH from META II.

147. Brda led Flamethrower and retained legal counsel, with Wes Christian, ESQ among others, to assist in the investigation. The group sought to engage shareholders and the public to gather information and raise awareness about the alleged market manipulation.

148. Flamethrower successfully brought attention to the concerns of MMTLP shareholders regarding potential market manipulation. The group's efforts led to increased public awareness and discussions about the issue, prompting some media coverage and responses from regulatory bodies.

149. In February of 2023, Christian interviewed publicly, regarding MMTLP he said, "You're going to see the mother lode of all, you know, shares that have been issued -that you know don't exist- come to the forefront. It's going to- it's going to pale GameStop, it is going to pale AMC."

150. As of December 8, 2024, there is limited publicly available information regarding the current activities of Flamethrower. The last notable public mention of Flamethrower was in March 2023, discussing its formation and objectives.

151. On February 6, 2023, Cromwell Coulson, President of OTC Markets, publicly acknowledged via a tweet that short positions still existed in NBH, despite its status as a private company not intended for public trading.

152. Coulson further stated that resolving these short positions would be "easier if Next Bridge shares became publicly tradable," implicitly highlighting the complications caused by FINRA's trading halt of MMTLP shares and the unresolved discrepancies in share counts.

153. Under 17 CFR 242.204, broker-dealers are required to close out failures to deliver (FTD) positions in equity securities resulting from short sales within the regulatory timeframe of T+4 (trade date plus four settlement days). This rule is designed to minimize disruptions in the

securities market caused by settlement failures and to prevent market abuses such as naked short selling.

154. The December 9, 2022, U3 trading halt on MMTLP, followed by the deletion of its ticker on December 13, 2022, prevented broker-dealers and market participants from closing out short positions within the regulatory timeframe mandated by Rule 204. The inability to trade or settle these positions resulted in unresolved failures to deliver, leaving significant short interest 'trapped' and non-compliant with Rule 204 requirements.

155. The MMTLP case illustrates the necessity for regulatory bodies, including the SEC and FINRA, to establish clear protocols to address close-out requirements during extraordinary circumstances, such as trading halts and ticker deletions. Without such mechanisms, the enforcement of Rule 204 remains inadequate, leaving market participants and retail investors vulnerable to systemic failures.

156. FINRA released its initial FAQ regarding the MMTLP corporate action and trading halt on March 16, 2023, 97 days after the halt. The FAQ failed to clearly define the 'extraordinary event' that justified the halt.

157. Despite receiving thousands of complaints from shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, this FAQ remained, to date, FINRA's only significant communication with shareholders regarding the halt.

158. On April 1, 2023, documents released through a Freedom of Information Act (FOIA) request revealed that the SEC and FINRA were aware of trading irregularities related to MMTLP as early as November 2021.

159.  High-ranking officials, including SEC Chairman Gary Gensler and FINRA President Robert W. Cook, were documented as having knowledge of these issues. Despite this, no substantive action was taken to resolve these irregularities or inform the investing public, further exacerbating market confusion and investor harm.

160.  On March 20, 2023, Fleming, a TD Ameritrade (Schwab) employee, admitted during a conversation with Traudt that the U3 halt of MMTLP trading on December 9, 2022, was requested by broker-dealers to "protect ourselves," directly acknowledging institutional interests rather than retail investor protection as the motive (Traudt v. Rubenstein, 2024, Docket Number: 2:34-cv-782, United States District Court for the District of Vermont). *(See Exhibit 59)*

161.  This conversation, which was recorded by TD Ameritrade (TDA), later Schwab, was initially made available for playback at Traudt's request but was later denied and made unavailable. (Traudt v. Rubenstein, 2024).

162.  On April 18, 2023, DuBose, then CEO of NBH, sent a letter to FINRA requesting assistance to address unresolved issues arising from the MMTLP spin-off, asking for access to the Blue Sheets.

163.  In the context of META II and its preferred shares (MMTLP), Blue Sheets would provide critical insights into the trading activities during the period of alleged market manipulation and synthetic share creation.

164.  For example, during the two-day trading window for MMTLP in December 2022, which ended with FINRA's U3 trading halt, Blue Sheets reveal the number of trades executed, the counterparties involved, and whether the transactions involved legitimate shares or synthetic ones.

165.  Given the allegations of naked short selling and the creation of synthetic shares, regulators' analysis of Blue Sheets could expose discrepancies in the total volume of shares traded versus the actual number of legitimate shares issued or prove all of these allegations unfounded.

166.  The lack of Blue Sheet transparency in the MMTLP case has been a critical point of contention for investors seeking clarity regarding the abrupt U3 trading halt and its impact on their holdings.

167.  Access to this data would not only clarify trading activity but could also serve as evidence in legal or regulatory actions addressing potential misconduct. This transparency is essential to restoring investor trust and ensuring accountability for any misconduct.

168.  DuBose outlined concerns regarding outstanding short positions in NBH shares and the negative impact on investors caused by FINRA's actions, including the December 9, 2022, trading halt.

169.  The letter also proposed a temporary trading period to facilitate the reconciliation of shares and sought FINRA's cooperation in addressing discrepancies to maintain market integrity.

170.  FINRA did not concur with his recommendations nor provide any meaningful remedy with their response letter on June 7, 2023.

171.  A supplemental FAQ was later published on November 6, 2023, 332 days after the halt. This FAQ, like the initial one, failed to clearly define the 'extraordinary event' that warranted the halt.

172. Despite tens of thousands of complaints submitted by shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, this supplemental FAQ marked only the second significant attempt by FINRA to communicate with shareholders about the halt.

173. To date, these two FAQs remain FINRA's only substantial communications with shareholders regarding the trading halt.

174. On September 27, 2023, during a House Financial Services Committee hearing, Representative Ralph Norman questioned SEC Chair Gary Gensler about MMTLP.

175. Norman inquired if Gensler was familiar with MMTLP and aware of its aggregate share count as of December 8, 2023. Gensler acknowledged familiarity with MMTLP but did not know the specific share count, suggesting it might be publicly available.

176. Norman expressed dissatisfaction with the SEC's responses and indicated plans to send another letter seeking detailed information.

177. On September 29, 2023, the Securities and Exchange Commission (SEC) issued a FOIA response confirming that it had received 246 complaints specifically related to the U3 trading halt of MMTLP between December 9, 2022, and September 15, 2023. This demonstrates substantial investor concern regarding the halt and its regulatory implications.

178. In October 2023, Palikaras was removed from his position as President and CEO of META II by the company's Board of Directors.

179. On December 22, 2023, Representative Ralph Norman led a letter to the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) concerning

META II's Series A preferred shares (MMTLP). This letter was co-signed by more than 70 members of Congress.

180. On January 15, 2024, multiple NBH executives, including DuBose (CEO) and Luke Hawkins (CFO), resigned without addressing shareholder concerns about unresolved trading issues during the MMTLP-to-NBH transition. These resignations occurred during a period of ongoing market uncertainty.

181. On January 31, 2024, the Securities and Exchange Commission (SEC) issued a response to a Freedom of Information Act (FOIA) request submitted on October 2, 2023, regarding complaints received about META II's Series A Preferred Shares/Dividend, also known as MMTLP. The SEC disclosed that a total of 848 complaints were received concerning MMTLP between December 9, 2022, and October 2, 2023. These disclosures highlight significant investor dissatisfaction and public concern over the regulatory handling of MMTLP.

182. On February 7, 2024, the Securities and Exchange Commission (SEC) acknowledged receiving 56,490 emails regarding MMTLP and related issues but has only officially responded to 35 of these complaints (0.0619%). This demonstrates the significant level of investor concern and dissatisfaction, as well as the SEC's apparent failure to adequately address or resolve the grievances of affected shareholders, raising questions about regulatory oversight and accountability.

183. On February 8, 2024, a NBH press release stated, "Subsequent to our most recent press release of January 19, 2024 calling for short interest data from all sources, foreign or domestic, whether registered with FINRA or not, we observed that FINRA clarified in its letter to Congressman Norman that the short interest figure it cited was only based on U.S. member data

and not that of 'domestic or foreign non-member entities that could act as custodians or agents holding securities for others, including foreign-registered broker-dealers.'"

184.  Furthermore, it continued, "However, it repeated its assertion [FINRA] that the short interest position it saw was 'nominal.' Unfortunately, we believe this is a consequential blind spot in FINRA's data, because foreign firms have approached Next Bridge about procuring more than 2.65 million shares." FINRA has also confirmed this number as fact as well.

185.  The letter continues, "Since nothing regarding the corporate action and the issuers' contemplated record or distribution dates changed between when the corporate action was submitted to FINRA for review, and when the U3 halt was issued (aside from the introduction of FINRA's own announcements), we remain confused as to why FINRA did not simply reject the corporate action announcement at the outset rather than issuing a halt for 'extraordinary circumstances' to the great surprise of the issuer and retail investors."

186.  The letter concludes with, "The end result was mass confusion that persists to this day amongst our investor base, many of whom feel they were unnecessarily and unfairly denied two days of trading, which would have also given parties with millions of short positions an opportunity to cover or close."

187.  John Doe 4 is a consultant for NBH, Inc., with a relationship evidenced by a promissory note dated February 29, 2024.

188.  The promissory note specifies that NBH unconditionally promises to pay CAPCO Holdings, Inc., a Texas corporation, the principal sum of $2,000,000, together with accrued and unpaid interest at a rate of 12% per annum. The note is secured by certain assets of NBH, as detailed in the agreement.

189. This note also references a consulting agreement executed between John Doe 4 and the company for $10,000 a month but specific details regarding his role or contributions have not been publicly disclosed, nor when formally asked by lawful shareholders.

190. On April 23, 2024, Aaron Chow, also known as Elephant Analytics on X, alleged that John Doe 4, doctored spreadsheets from the Texas Railroad Commission and posted them on April 20, 2020. These posts were purportedly intended to raise confidence and bolster interest in the Orogrande Asset, which would later become part of NBH through the Preferred Dividend that evolved into MMTLP and NBH.

191. Aaron Chow's post on X clearly displays a standard query from the Texas Railroad Commission indicating that the oil quantity from Orogrande wells is 0 units. In contrast, John Doe 4's displayed query from the Texas Railroad Commission shows 1,926 units.

192. On June 5, 2024, over 70 Members of Congress, led by Representatives Ralph Norman and Pete Sessions, sent a follow-up letter to SEC Chairman Gary Gensler. The letter reiterated requests for an investigation into FINRA's December 9, 2022, U3 halt on MMTLP shares and the subsequent unresolved trading discrepancies.

193. The letter emphasized that FINRA's actions led to widespread investor harm and confusion, with over 40,000 letters received from affected constituents. It called for transparency, an independent audited share count, and a briefing on the SEC's findings.

194. In June 2024, the U.S. Securities and Exchange Commission (SEC) charged Torchlight and its successor META II and its former CEOs, including Brda, with market manipulation and fraud.

195. To the best of the Plaintiffs' knowledge and belief, the major difference between Palikaras and Brda or McCabe is that Palikaras did not sell any shares of META II or MMTLP during the period in question. In other words, he did not profit from the run-up or the halt—if anything, he effectively lost millions of dollars during this time, unlike the other two Defendants.

196. Following these allegations, META II agreed to settle the SEC's charges in an administrative proceeding, resulting in a $1 million penalty. However, litigation against Palikaras and Brda is ongoing in federal district court (Securities and Exchange Commission v. John Brda and Georgios Palikaras, U.S. District Court for the Southern District of New York, Case Number 1:24-cv-04806, 2024).

197. On August 9, 2024, META II filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Nevada (Case No. 24-50792). This filing initiated the process of liquidating the company's assets to repay creditors. *(See Exhibit 72)*

198. As a result of the bankruptcy filing, all remaining employees and executive officers, including President and CEO Uzi Sasson and Chief Legal Officer Dan Eaton, were terminated. Additionally, the entire Board of Directors, chaired by Jack Harding, resigned, effectively dissolving the board.

199. Within 12 months from the bankruptcy filing, Director and Audit committee member, Eugenia Moralles and CFO Ahmed Shebl, and Palikaras' successor CEO Jim Fusaro resigned.

200. The bankruptcy proceedings are ongoing, with a Chapter 7 trustee appointed to oversee the liquidation of the company's assets in accordance with the Bankruptcy Code.

201.  If META II's bankruptcy leads to the discharge of debts or obligations linked to the MMTLP situation, individuals like Brda or McCabe (depending on their involvement) might avoid legal or financial repercussions stemming from investor lawsuits or regulatory scrutiny.

202.  A bankruptcy proceeding might complicate efforts to access critical financial or operational records. This could hinder investigations into trading irregularities, synthetic shares, or other market manipulation allegations tied to MMTLP, providing plausible deniability for those involved.

203.  Bankruptcy could allow participants with short positions or other financial entanglements to benefit from a market reset. If shares become delisted, worthless, or consolidated, short-sellers might avoid covering their positions at higher costs, particularly if synthetic shares were involved.

204.  Bankruptcy could enable some actors to shift blame onto external circumstances, including financial distress or mismanagement within META II, rather than acknowledging market manipulation, synthetic shares, or improper handling of the MMTLP spin-off and trading halt.

205. If META II's assets were sold off during bankruptcy, market participants might acquire valuable intellectual property or technology at a discount, potentially profiting from META's collapse while distancing themselves from the controversies surrounding MMTLP.

206. Wes Christian, ESQ has been frequently mentioned online in connection with the META II bankruptcy trustees, reportedly working to investigate whether shorting or spoofing activities took place.

207. Christian was publicly involved with Flamethrower, alongside Brda, in efforts to uncover evidence of alleged naked short selling in MMTLP. However, there is no public record

indicating that any claims of illegal activity were formally identified or brought before a court of law between March 2023 and the present.  In Plaintiff's belief this was a distraction for shareholders of MMTLP.

208.  As of February 8, 2024, the SEC acknowledged receiving 848 complaints related to MMTLP through FOIA disclosures, alongside approximately 56,490 emails regarding MMTLP sent by concerned investors. This volume of complaints is unprecedented and reflects the extraordinary financial and emotional harm experienced by shareholders as a result of the U3 halt and the lack of transparency surrounding its implementation.

209.  The indefinite suspension of MMTLP trading occurred during a critical corporate transition, as the security was set to convert into private shares of NBH. Unlike typical halts tied to reorganizations or share cancellations, FINRA failed to provide the public with an adequate explanation or notice aligned with these established regulatory practices. This deviation created confusion and uncertainty among shareholders, amplifying their financial losses.

210.  On October 2, 2024, University Lands issued a formal termination letter to Hudspeth Operating (HudOp), a subsidiary of NBH, citing breaches of the Development Unit Agreement (DUA) due to the non-payment of annual royalties and HudOp's refusal to fulfill its drilling obligations for the 2024 operational year.

211.  The termination letter also highlighted HudOp's lack of any concrete plans for future development of the Orogrande lease, further demonstrating its failure to meet the terms of the agreement. University Lands demanded the release of the lease within 90 days and retained the right to pursue legal remedies if HudOp failed to comply with its environmental responsibilities, including plugging existing wells and remediating the land.

212.  In response to the October 2, 2024, termination of the Orogrande lease, McCabe, Chairman and CEO of NBH, expressed disappointment with University Lands' decision, framing it as a setback for the company.

213.  However, NBH has not taken any formal corporate measures to address the lease termination, leaving shareholders questioning the company's commitment to the Orogrande project and its broader operational strategy. This lack of action has further fueled concerns about NBH's management and the viability of its core assets.

214.  On November 8, 2024, the plaintiff, a shareholder of NBH, submitted a formal Request for Information (RFI) to NBH. The RFI raised critical questions regarding corporate governance, the total share count, discrepancies in share delivery, and the resolution of potential naked short selling.

215. Despite the legal rights granted under Texas Business Organizations Code Section 21.218 and Nevada Revised Statutes Chapter 78.257, NBH failed to provide a comprehensive response to the RFI within the 14-day deadline specified.

216. The RFI was sent by Plaintiff via email to NBH Investor Relations at nextbridge@dennardlascar.com, where it was confirmed received on November 11, 2024. The same RFI was also sent by USPS Registered Mail to NBH's registered address at 300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116, on November 8, 2024; however, it was not received at that location.

217. This lack of response obstructed the shareholder's ability to assess management practices and investigate discrepancies, raising concerns about transparency and adherence to fiduciary obligations.

218. A formal Books and Records Check was demanded from McCabe and NBH by the Plaintiffs on November 19, 2024, by the Plaintiffs, and seven other shareholders. This letter requesting lawful shareholder access to records held by McCabe and NBH was officially served to McCabe at 500 W Texas Ave Ste 890, Midland, TX 79701.

219. To date, no response to the Books and Records Check has been received from McCabe or NBH.

220. On November 25, 2024, NBH issued an official communication via investor relations email stating that the company had relocated its corporate offices from 300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116, to Midland, Texas, within the offices of McCabe Petroleum Corporation (MPC) under a rent-free agreement.

221. The announcement omitted the full address of the new location and contradicted existing public records, including NBH's most recent SEC Form 10-Q filed on September 30, 2024, and its last EDGAR filing on October 8, 2024, which both listed the Fort Worth address as its business location.

222. Additionally, USPS and internet records continue to reflect the Fort Worth address, creating confusion and undermining transparency regarding NBH's corporate headquarters.

223. USPS Registered Mail, with the RFI and demand letter, was also sent to the MPC address, 500 W Texas Ave Ste 890, Midland, TX, 79701, on November 26, 2024. To date, no response has been received.

224. NBH did not provide the requested documentation or address the substantive inquiries within the seven-day response period stipulated in the letter. This failure further compounded

concerns about NBH's transparency and potential violations of fiduciary duties to its shareholders and spurred legal action.

225. As of December 4, 2024, there is no publicly available information indicating that Representative Ralph Norman's letter to the SEC and FINRA regarding MMTLP has led to any significant regulatory actions or policy changes.

226. While the letter, co-signed by over 70 members of Congress, called for a comprehensive review of the events surrounding MMTLP, the SEC and FINRA have not publicly disclosed any substantial measures taken in response.

227. Throughout 2019 and 2022, the Depository Trust & Clearing Corporation (DTCC) managed the clearing and settlement processes for TRCH, MMAT, and MMTLP trades.

228. To date, no publicly available information indicates that the DTCC has taken any action, either before or after the U3 halt by FINRA, to resolve share counts, address short interest, or reconcile and audit the numerous settlement concerns related to MMTLP shares.

229. From late 2022 through 2024, AST/EQ, acting as the designated transfer agent, managed the shareholder reconciliation process during the transition of MMTLP shares to NBH. Shareholder records during this period reflected discrepancies in share counts, which were left unresolved.

230. To date, neither AST/EQ (Equiniti) nor NBH has produced a publicly available document reconciling the share count for MMTLP, despite nearly two years having passed since the NBH spin-off. This failure to provide a transparent accounting of outstanding and beneficially owned shares has left investors without critical information necessary to validate ownership and address systemic discrepancies.

231. Throughout 2022 and 2024, regulatory bodies including FINRA, the SEC, and the DTCC did not coordinate effectively to address market irregularities in TRCH, MMAT, and MMTLP trading. This lack of coordination contributed to prolonged issues with share reconciliation and investor harm.

232. To date, no formal or publicly available plan to remedy the "extraordinary event" involving MMTLP shares has been recommended or implemented by the SEC, FINRA, or DTCC, leaving investors without resolution or recourse.

233. As of the present date, NBH has not been assigned a CUSIP number for all its shares, leaving its securities without a standardized identifier for trading or record-keeping purposes.

234. This absence creates challenges in identifying and managing transactions involving NBH's common stock, complicating compliance with financial reporting standards and market transparency.

235. Reports and social media posts featuring redacted brokerage statements indicate that hundreds of individuals, collectively holding thousands of shares, remain affected. In total, thousands, if not millions, of shares remain unreconciled more than two years after the spin-off, irrespective of the FINRA-imposed U3 halt.

236. The inability to reconcile all MMTLP shares to NBH shares, two years later at AST/EQ, highlights a major gap in ensuring the orderly trading and tracking of its securities within financial markets.

237. Despite tens of thousands of complaints submitted to FINRA, the SEC, and Congressional Representatives, no Congressional hearings or meaningful investigations have taken place.

Shareholders remain unable to trade their positions, and MMTLP investors continue to face financial harm with no clear recourse.

238.  Public records and shareholder complaints from 2023 and 2024 indicate systemic delays in resolving trading discrepancies related to MMTLP shares. Retail investors were left without a clear resolution or recourse for their financial losses.

239.  The prolonged inaction by regulatory bodies, over the last two years, combined with unresolved trading irregularities, has contributed to diminished trust in the transparency and fairness of U.S. financial markets. Retail investors remain uncertain about the status of their holdings and future resolutions.

240.  Retail investors have experienced ongoing difficulties in accessing their investments in MMTLP shares following the U3 halt. The lack of liquidity has resulted in prolonged financial uncertainty and loss.

241.  To date, FINRA has refused all attempts to provide access to the Blue Sheet records for META II (MMAT) and MMTLP, despite repeated requests from shareholders, legal and government representatives, or advocacy groups seeking transparency regarding trading activity.

242.  FINRA's decision not to release Blue Sheet records has prevented retail investors from accessing critical information regarding trading activity, raising concerns about regulatory transparency, accountability, and market integrity.

243.  Throughout the MMTLP-to-NBH transition, regulatory bodies have deflected responsibility for addressing trading irregularities, leaving investors without a resolution for two years. The lack of clear accountability has prolonged market instability and shareholder uncertainty.

244. Retail investors have borne the brunt of systemic inefficiencies, regulatory inaction, and market manipulation, suffering significant financial losses while institutional actors have largely escaped accountability.

245. The continued lack of resolution for the MMTLP event has eroded investor confidence in the integrity and the assumption of fairness in U.S. financial markets.

246. George Palikaris posted the following on linkedin.com with a photo of a demand letter dated June 28, 2024. The demand letter is from the Snell & Wilmer law firm, Charles E. Gianelloni, ESQ representing George Palikaris. He says in the demand letter written to Dan Eaton, ESQ, "contain material inaccuracies that harm META's ability to maximize shareholder value for a sale because interested buyers don't have current, accurate information on which to base offers for META or its assets."

On a post authored on Linkedin.com five months ago, George Palikaris calls out "Uzi Sasson, Jack Harding, Allison Christillaw, MBA, ICD.D Board Director, Steen Karsbo, Ken Hannah, and Philippe Morali to RELEASE the non-confidential teaser document and reveal who the the financial advisory firm is…" It is in the plaintiff's view that throughout these transactions dating back to Torchlight through Nextbridge Hydrocarbons, George Palikaris did not gain financially from these transactions, and he lost his company due to the board of directors and Meta Materials is now being "dismantled before our eyes" Palikaris expressed in his post.

247. On 7/10/24 on a recorded podcast called Real America with Dan Ball, Congressman Ralph Norman commented MMTLP "shareholders got taken" and "CEOs sold a worthless stock" and it was a "shell game, shame game."

## V.    **ALLEGATIONS**

248. I, Jennifer Vetrano, hereby allege that John Brda, in his capacity as the former Chief Executive Officer of Torchlight Energy Resources and a consultant to Meta Materials before the U3 Hault of MMTLP, has breached his fiduciary duty owed to shareholder of MMTLP.

In December 2014 John Brda was appointed as the CEO of Torchlight Energy Resources and in addition Brda worked as a consultant to Meta Materials following the Merger of Torchlight Energy Resources and Meta Materials in June 2021. His role involved advising on the integration of the two companies and leveraging his experience in the oil and gas sector to support Meta Materials' strategic initiatives. These roles established a fiduciary relationship that required Brda to act in the best interests of MMTLP shareholders.

As a fiduciary, John Brda was obligated to act with loyalty, care, and good faith, avoiding conflicts of interest and ensuring the best interests of the two Corporations were prioritized.

Despite these obligations, John Brda engaged in the following actions that constitute a breach of fiduciary duty:

- Concealing pump and dump schemes from the market through misstatements and omissions.

- Deceptively marketed and promoted the narrative with social media influencers that the Preferred Dividend would cause a short squeeze in furtherance of their plan to artificially inflate Torchlight and MMTLP stock since 2020.

- Failed to report the MMTLP start of trading to the SEC or take any legal action to stop the transaction due to his fear that his prior business dealings would be investigated.

- When the MMTLP share price and/or trading volume increased, Brda discussed how "he hadn't sold a share" to influencers, shareholders and potential shareholders. He did in fact sell about 300,000 shares of MMTLP pre-U3 hault between November 15 and December 5, 2022.  During this period the trading price of MMTLP ranged between $2.90 and $9.90.  Based on this price range, Brda's transactions generated proceeds estimated between $870,000 and $2,970,000. (Securities Lawyer 101, Meta Materials Executives, John Brda and George Palikaris, charged with Market Manipulation, Fraud and other violations).

As a direct result of John Brda's breach of fiduciary duty, ultimately over sixty five thousand MMTLP shareholders suffered a significant financial loss, which has caused significant harm and emotional distress to the shareholders.  From 11/22/22 to 12/8/22 the plaintiff purchased 893 shares at all different prices with an average share price of $8.25, which fidelity changed to $2.90 (Fidelity Statements 2022 Tax Reporting Statement page 14-15 and Fidelity Positions page 1).  At the close of trading on December 8, 2022, deal-broker Level 2 data revealed that short position holders in MMTLP utilized the 505 code (commonly referred to as S.O.S.), signifying a heightened urgency to close their positions. The data reflected transaction prices reaching and exceeding 100 times the closing price of $2.90 per share (i.e., $290.00+), an extraordinary deviation characteristic of a severe share imbalance.

Furthermore, after December 8, 2022, limit orders ranging from less than $100 to as much as $200,000 per share were submitted through various brokerages but were marked as "too late to cancel." This indicated significant irregularities in the handling of MMTLP trades, affecting

more than 65,000 shareholders (Traudt v. Rubenstein, 2024, Docket No. 2:34-cv-782, U.S. District Court for the District of Vermont).

Therefore, I allege that John Brda has breached his fiduciary duties, and I seek compensation for damages, as well as any other appropriate remedies.

249. I, Jennifer Vetrano, hereby allege that prior to the U3 haul on December 9, 2022, the defendants, operating under the alias "John Doe 1-20" and "Jane Doe 1-20" began promoting the MMTLP preferred dividend on various social media platforms, including Twitter/X, Stock Twits, Reddit, Youtube and other media platforms. The defendants made numerous false and misleading statements about the oil and gas assets, future prospects, and market mechanics, claiming that the stock was poised for significant gains and a short squeeze (due to "shorts having to close their positions before entering Nextbridge Hydrocarbons) picking up where the Torchlight pump had left off. In the plaintiff's view these social media influencers acted as proxies for Nextbridge Hydrocarbons and/or Brda.

As a result of these promotions, the stock price of MMTLP started to see a significant increase by October 2022 in volume and price. By the end of October, it was trading above $6. Then on November 21, 2022 the stock hit a historic high of $11.65. As the December 12, 2022 record date neared, the volume increased significantly and dropped accordingly. On December 9, 2022 the MMTLP stock price was $2.90.

The plaintiff, relying on the defendants' false statements purchased MMTLP stock, average price $8.25 per share, suffering financial losses when the stock price subsequently collapsed.

The defendants' actions constitute securities fraud under section 10 (b) of the securities Exchange act of 1934 and Rule 10b-5 promulgated thereunder. Therefore, the plaintiff seeks compensation for damages, as well as any other appropriate remedies.

250.  I, Jennifer Vetrano, hereby alledge that multiple John Does and Jane Does have cyberbullied plaintiff on multiple occasions.  These attacks on Twitter/X threatened the plaintiff's job, life and contributed to defamation of character which caused emotional distress and anxiety.

Between December 9, 2022 and December 2024 I have been continuously cyberbullied by John Doe 6. He has continuously referred to me as "drunk broad" and "garbage human" and has called me demeaning explicit names on various X/twitterspaces that he has hosted.  On one occasion he photoshopped a personal facebook picture of the plaintiff without permission and made it a sexually violent and explicit picture which was viewed by over two thousand people and reposted by John Doe 6 and John Doe 8.  John Doe 6 also hosted a twitterspace which someone created a parody account of the plaintiff and John Doe 8 reposted it to the twitterspace "nest" to circulate it.  This parody account posted, "Someone is taking credit for maliciously targeting a victimized $MMTLP community by intentionally and fraudulently reporting accounts subsequently having them suspended….BUT the heart break is for this person's lack of intelligence.  This person has a unlocked Linkedin."  It was of the belief of the plaintiff that John Doe 6 and John Doe 8 worked together to encourage harassment (via this X/twitterspace and distribution of these tweets) on plaintiff's linkedin page which would potentially threaten plaintiff's career and livelihood.  Another person that read one of the tweets replied to it with a question, "was this a task the discord forced people to do?"  It was my belief that multiple influencers were harassing other shareholders of MMTLP based on their beliefs of how the

MMTLP stock situation would gain resolution and distracting shareholders from taking legal action. These influencers have spent hundreds of hours hosting X/twitterspaces encouraging shareholders to bombard Congress with the message that MMTLP shareholders need an audited, aggregated share count and blaming the entirety of the situation on Finra. I also have witnessed two other people's lives threatened on X/twitter by John Doe 6 via X/twitter posts and recorded twitter/X calls. I reported the harassment to X/twitter, and as of December 2024 John Doe 6's main profile was removed from X and he created a new one. John Doe 6 also posted that "I have info on plenty of people in this community, and those that have crossed me will look over their shoulders."

John Doe 8 created numerous memes from pictures he obtained from my social media without my permission that were sexually explicit, demeaning, and defamatory. He then circulated it around the X/twitter platform, encouraging others to take part in the harassment across media platforms. The plaintiff reported the harassment to the X platform however no action was taken by X.

John Doe 7 obtained my picture from the X platform and made many defamatory remarks about the plaintiff appearance and 65 or more people saw it and it was recirculated on X. In a separate X tweet he sent a direct message through the platform to another shareholder which read, "I know your name and where you live homeboy keep f* around and find out." Then he goes on to say "hundreds of billions of dollars are at stake in this play, keep running your mouth, they want you too….not my call, rich people on both sides of this play and they want certain people no longer breathing………..so I suggest you shut the f* (explicit language) and get in line like I have. All im saying is a lot of people don't like you and your name and addy is public…just sayin…id be nicer to people. Probably for your own good. I mean even if it comes down to it,

you can get sued for defamation." John Doe 7 also collected money via a go-fund me organized by Jane Doe 4 which they referred to as "I don't wanna work fund" where these people collected $7,175 off of MMTLP shareholders.

251. John Doe 9 claimed on multiple occasions he has participated in zoom calls with Greg McCabe. On a recorded space on X/twitter he relays to shareholders, "I just got off a zoom call with Mr. Greg McCabe and he wanted me to wish everyone Happy Thanksgiving. And just so you all know the reason why the new address was put out in the PR so that people that talk about lawsuits, send them, hes ready. Bring it!" John Doe 9 participated in a X/Twitterspace with the plaintiff and appeared to be under the influence of a substance on December 7, 2024. He made numerous threats to plaintiff and another woman participating in the X/twitterspace call. The threats included "I am going to find you….I will find you trust me" and "come to my house tomorrow I will show you who the f* I am." to the other woman in the space. He goes on to defame her by calling her explicit names. The threat to the plaintiff was "I know where you live." "Someone needs to be made an example of and you will be the first one."

252. Plaintiff has also has in her possession two pages of tweets that multiple MMTLP influencers have created in order to intimidate or harass or encourage people to act in a violent nature to certain MMTLP shareholders, institutions such as Finra or individuals such as Gary Gensler. This is another example of how It was my belief that multiple influencers were harassing other shareholders of MMTLP based on their beliefs of how the MMTLP stock situation would gain resolution and distracting shareholders from taking legal action for discovery, and perpetuating the narrative discussed by Brda that the MMTLP fiasco was Finra's fault.

253. John Doe 4, is a consultant for NBH, with a relationship documented through a promissory note dated February 29, 2024, and a consulting agreement providing $10,000 per month in compensation. Plant has been publicly associated with promoting the Orogrande Asset and the broader narrative surrounding its value and potential, including claims of significant oil reserves therein. On June 15, 2021 John Doe 4 posted on X "the special dividend will likely payout $10 to possibly $20 per share. Oragrande has 3.7 billion bi reserve with oil at $70 plus it's a slam dunk." On April 20, 2022 via X, John Doe 4 photoshopped images and discusses "proven oil" and incorrect data from the railroad commission in Texas.

254. Brda is a currently a co-founder and managing partner at Olivon Advisors. On the website on his profile it is written that "though his family office, Brda & Company, Mr. Brda has been a prolific investor in public and private companies. As CEO of a NASDAQ listed O&G company, Torchlight Energy. Mr. Brda successfully raised over $150 million in equity and debt capital. Having founded and successfully exited a billion dollar NASDAQ entity, Mr. Brda is now helping other CEOs in their similar pursuits."

255. I, Jennifer Vetrano, hereby allege that the Members of the Board of Meta Materials breached fiduciary duties by neglecting to take legal action any entities to block trading of MMTLP stock. In the plaintiff's opinion the Meta Materials accounting and legal practices have been questionable based on tweets from George Palikaris five months ago on Linkedin.

The Plaintiff further highlights the role of META II in failing to disclose material information, address trading irregularities, and reconcile outstanding share discrepancies. These corporate Defendants breached their fiduciary duties to shareholders under the Investment Company Act and other applicable statutes. Their actions and omissions, including the issuance of misleading

public statements and failure to implement internal controls as required under Sarbanes-Oxley Act Sections 302 and 404, directly contributed to shareholder harm and prolonged uncertainty. In the plaintiff's viewpoint their failure to act contributed to prolonged harm to shareholders.

## COUNT I:

### Violation of the Securities Exchange Act of 1934
### (15 U.S.C. §§ 78j(b), 78i(a)) – Against All Defendants

256. Defendants violated Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by engaging in manipulative practices, including the proliferation of synthetic shares, the creation of artificial supply, and the failure to ensure market transparency. OTC Markets facilitated unauthorized trading of MMTLP shares, while Canaccord Genuity engaged in improper filings and trading practices that contributed to these manipulative activities.

257. META II leadership violated Section 13(d) (15 U.S.C. § 78m(d)) by failing to disclose material information regarding beneficial ownership and discrepancies in outstanding shares, thereby misleading investors about share structures and asset values.

258. Defendants violated Rule 13b2-2 (17 C.F.R. § 240.13b2-2) by making false or misleading statements to auditors and failing to maintain accurate financial records related to MMTLP share discrepancies.

## COUNT II:

### Violation of the Sarbanes-Oxley Act (15 U.S.C. §§ 7241, 7262) – META II Board of
### Directors

259.  META II leadership violated Section 302 of the Sarbanes-Oxley Act by making false certifications regarding financial disclosures, share issuance, and outstanding share counts, misleading investors and regulators.

260.  META II leadership further violated Section 404 by failing to establish and maintain adequate internal controls over share reporting and reconciliation, resulting in widespread share discrepancies and financial harm to investors.

## COUNT III:

### Violation of Regulation FD (17 C.F.R. § 243.100) – Against META II Board of Directors

261.  META II leadership failed to ensure fair disclosure of material information regarding share issuance, synthetic share problems, and asset valuations. Defendants selectively withheld information about the MMTLP-to-NBH transition from retail investors, violating their obligations under Regulation FD.

## COUNT IV:

### Fraudulent Inducement and Misrepresentation – Against  META II Leadership

262.  META II leadership made false and misleading statements regarding asset valuations, share issuance, and tradability, inducing investors to rely on inaccurate information. These misrepresentations caused substantial financial harm to shareholders.

## COUNT V:

### Emotional Distress (Negligent or Intentional Infliction) – Against All Defendants

263. Defendants acted with reckless disregard for the foreseeable harm caused by the U3 halt, unresolved share discrepancies, and systemic market manipulation. These actions directly caused severe emotional and financial distress to the Plaintiff.

## COUNT VI:

### Conspiracy to Commit Fraud – Against All Defendants

264. Defendants conspired to manipulate securities markets through the creation of synthetic shares, naked short selling, and other deceptive practices, in violation of Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5.

265. Defendants engaged in a coordinated scheme to suppress MMTLP's value and mislead investors regarding share issuance, outstanding shares, and corporate actions, collectively enabling systemic fraud.

## COUNT VII:

### Breach of Fiduciary Duty

266. Brda, Christilaw, Harding, Sasson, Eaton, Guitton, Leslie, Morali, Hannah, and Karsbo breached their fiduciary duties while they were executives while MMTLP started trading and U3 halt occurred on December 9, 2022. These actions directly caused severe emotional and financial distress to the Plaintiff.

### Defendant Inclusion Summary

267. The following Defendants, through their actions, omissions, negligence, breaches of fiduciary duty, and intentional misconduct, contributed to systemic market failures, suppressed

retail investor rights, and enabled manipulative, anti-competitive, and fraudulent practices. Their collective conduct resulted in violations of federal securities laws, antitrust statutes, breaches of fiduciary duty, conspiracy to commit fraud, and significant financial and emotional harm to the Plaintiffs. While the specific roles of each Defendant are detailed throughout this Complaint, the Defendants share culpability for creating and sustaining the conditions that led to these violations:

268. Corporate Leadership (Including Brda, Christilaw, Harding, Sasson, Eaton, Guitton, Leslie, Morali, Hannah, and Karsbo): Included in Counts for their roles in perpetuating trading irregularities, synthetic share proliferation, and shareholder harm. Executives such as; Brda, Christilaw, Harding, Sasson, Eaton, Guitton, Leslie, Morali, Hannah, and Karsbo to disclose material information, reconcile outstanding share discrepancies, and address systemic market irregularities. Their breaches of fiduciary duty, misstatements regarding asset valuations, and failure to ensure transparency exacerbated investor uncertainty and financial harm.

269. By their actions and omissions, all Defendants have demonstrated a pattern of negligence, misconduct, breaches of fiduciary duty, and conspiracy to commit fraud. Their collective conduct has violated federal securities laws, antitrust statutes, and other regulatory obligations, undermining market integrity and suppressing the rights of retail investors. Judicial intervention is necessary to hold these entities accountable, redress the harm suffered, and prevent future market abuses.

a) Corporate Leadership (Brda, Christilaw, Harding, Sasson, Eaton, Guitton, Leslie, Morali, Hannah, and Karsbo);

i. Misrepresentation of asset valuations: Leadership overstated the value of Orogrande Basin assets to mislead investors and inflate shareholder expectations.

ii. Encouragement of trading during irregularities: Executives encouraged trading activity despite knowledge of systemic discrepancies and trading irregularities.

iii. Failure to address synthetic shares: Leadership failed to investigate or resolve synthetic share issues, neglecting their fiduciary responsibilities to shareholders.

iv. Misleading shareholder communications: Executives failed to disclose material information regarding trading irregularities and share discrepancies, creating prolonged investor uncertainty.

v. Neglect of fiduciary duty: Corporate leadership prioritized personal and corporate interests over shareholder protection, directly contributing to financial harm.

## VI.    <u>CONCLUSION</u>

270.  The Plaintiff Jennifer Vetrano has brought this action to address systemic failures in the U.S. financial markets that have inflicted widespread harm on retail investors through a combination of regulatory negligence, market manipulation, breaches of fiduciary duty, and constitutional violations.

271.  The Plaintiff contends that social media influencers played a pivotal role in the pump and dump of MMTLP stock.  These social media influencers weaponized their following to affect MMTLP share price pre and post U3 halt.

272. The Plaintiff contends that many social media influencers are under non-disclosure agreements and are privy to non-public information via executives pertaining to MMTLP stock. These social media poster act as proxies for executives and/or Nextbridge Hydrocarbons.

273. The Plaintiff contends that many social media influencers involved with MMTLP have threatened other shareholders lives and livelihoods if they do not agree on the same path of resolution and continue to date to steer shareholders away from legal action for discovery.

274. Corporate leadership at Torchlight Energy Resources (Brda) and Meta Materials Board (Christilaw, Harding, Sasson, Eaton, Guitton, Leslie, Morali, Hannah, and Karsbo) compounded the harm by failing to address systemic trading irregularities and reconcile shareholder positions. Executives, including; Brda, and Christilaw, Harding, Sasson, Eaton, Guitton, Leslie, Morali, Hannah, and Karsbo , misrepresented critical information about asset valuations, particularly regarding the Orogrande Basin, and neglected their fiduciary duties to shareholders. Their collective inaction and misleading public statements left retail investors, including the Plaintiffs, vulnerable to systemic market manipulation.

a) The harm caused by these failures is significant, systemic, and ongoing. Tens of thousands of retail investors have been denied the ability to trade their shares, reconcile their holdings, or recover the fair value of their investments. Meanwhile, institutional participants who engaged in manipulative practices, including naked short selling, remain unaccountable. This disparity highlights critical vulnerabilities in the regulatory framework and underscores the urgent need for judicial intervention to restore fairness, transparency, and accountability to the markets.

275. The Plaintiff emphasizes the glaring inconsistency in regulatory responses between the MMTLP case and the GameStop trading episode. In the aftermath of GameStop, swift Congressional hearings and regulatory interventions ensured market disruptions were addressed promptly. In contrast, MMTLP investors have endured nearly two years of inaction and neglect. This systemic bias in favor of institutional participants highlights the inequities faced by retail investors and demonstrates the need for consistent regulatory enforcement to uphold investor rights and market integrity.

276. The refusal by FINRA, the SEC, and the DTCC to disclose critical trading data, such as Blue Sheets and settlement records, has further compounded investor harm. This lack of transparency has obstructed efforts to investigate market manipulation, reconcile discrepancies, and hold wrongdoers accountable. The systemic withholding of such vital information underscores broader vulnerabilities in regulatory frameworks and necessitates judicial oversight to ensure transparency and accountability.

a) In bringing this action, the Plaintiffs seek more than individual relief. This case represents a broader challenge to the systemic deficiencies and constitutional violations that have allowed market abuses to flourish unchecked. The Plaintiffs respectfully request this Court to grant declaratory and injunctive relief to restore fairness to the markets, including addressing FINRA's unconstitutional governance structure, enforcing statutory limits on trading halts, and ensuring meaningful government oversight of private entities exercising delegated authority.

b) The Plaintiff also demands accountability for the Defendants' violations of federal securities laws, antitrust statutes, and fiduciary obligations. Compensatory and punitive damages are necessary to redress the financial and emotional harm suffered by retail investors. In addition, systemic reforms must be implemented to prevent future abuses, including mechanisms to

eliminate synthetic shares, enforce Regulation SHO requirements, improve market transparency, and ensure accurate reconciliation of shareholder positions.

c) By adjudicating the claims presented, this Court has an opportunity to establish critical legal precedents that promote regulatory accountability, enforce transparency, and restore public confidence in the financial markets. The Plaintiff joined by tens of thousands of similarly affected retail investors, seek a ruling that upholds the rule of law, prioritizes market integrity, and delivers justice to those who have been unjustly harmed by systemic misconduct.

d) Finally, this case calls upon the Court to safeguard the rights of retail investors and reaffirm the principles of constitutional governance. The Plaintiffs urge the Court to deliver a ruling that holds the Defendants accountable for their misconduct, addresses systemic regulatory failures, and ensures the integrity of U.S. financial markets for all participants.


## VII.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE,**

277.  Plaintiff pray for judgment in their favor and request relief as follows:

1) Declaratory Relief:

a) Injunctive Relief to Restore Transparency and Prevent Future Abuses:

i. Comprehensive Market Audit: Order a full audit of all TRCH, MMTLP, MMATF, MMAT, and MMATQ share transactions, including the identification and reconciliation of synthetic shares, fails-to-deliver (FTDs), and beneficial ownership records.

ii. Public Disclosure of Data: Mandate the release of all trading data, records, and communications related to MMTLP and MMAT shares, including information held by FINRA, DTCC, broker-dealers, Wes Christian, ESQ, and other involved parties.

iii. Injunction to Reinstate Trading or Equitable Resolution: Require an expedited and transparent process for the reinstatement of trading of MMTLP shares, or in the alternative, mandate an equitable shareholder resolution that provides compensation or recovery of value for all affected investors. This process must include independent oversight, shareholder participation, and clear timelines to ensure fairness and accountability.

iv. Independent Oversight: Appoint an independent special master or neutral third-party overseer to monitor the full audit, reconciliation, and implementation of systemic reforms to ensure transparency, accountability, and compliance.

v. Congressional and Regulatory Review: Require Congressional and regulatory review of policies related to trading halts, synthetic share creation, and oversight of self-regulatory organizations (SROs) to prevent future systemic failures.

b) Compensatory Damages to Redress Financial and Emotional Harm:

i. Award compensatory damages for the loss of value and liquidity of Plaintiff's MMTLP shares and share caused by Defendants' misconduct.

ii. Award damages arising from the suppression of share prices and trading opportunities caused by synthetic share creation, naked short selling, and the improper U3 halt.

iii. Award recovery of Plaintiffs' documented financial losses, as well as additional losses caused by systemic harm to market value.

iv. Award compensatory damages for emotional distress and mental anguish resulting from Defendants' prolonged misconduct, refusal to resolve the U3 halt, and failure to provide clarity or remedies for trading irregularities.

c) Treble Damages for Antitrust Violations:

i. Award treble damages pursuant to the Sherman Antitrust Act (15 U.S.C. § 15) and the Clayton Act, to redress Defendants' anti-competitive practices, which restrained market competition, fostered monopolistic environments, and caused disproportionate harm to retail investors, including Plaintiff.

d) Disgorgement of Ill-Gotten Gains:

i. Order the disgorgement of profits wrongfully obtained by Defendants, including market makers, broker-dealers, and transfer agents, through the trading of synthetic shares, naked short selling, and related market manipulation.

e) Establishment of Restitution Fund for Retail Investors:

i. Require the creation of a structured restitution fund to compensate all affected shareholders for financial harm caused by synthetic share discrepancies, naked short selling, and manipulative trading practices.

f) Punitive Damages:

i. Award punitive damages to deter Defendants and others from engaging in similar wrongful conduct in the future.

g) Audit of META II's Chapter 7 Bankruptcy Proceedings:

       i. Order an independent audit of META II's Chapter 7 bankruptcy proceedings to ensure transparency, identify any irregularities, and determine whether institutional participants unfairly benefited from liquidation or market resets.

    h) Regulatory Oversight Improvements:

       i. Require the Securities and Exchange Commission (SEC) and to establish clearer guidelines for regulatory intervention in cases of market irregularities, including; improved oversight and enforcement mechanisms to prevent synthetic share proliferation, naked short selling, & prolonged trading halts and enhanced accountability and transparency measures regarding corporate actions, share reconciliations, and market-making practices.

    i) Pre- and Post-Judgment Interest:

       i. Award pre- and post-judgment interest on all compensatory damages to account for the time value of Plaintiffs' losses and to ensure full recovery of the harm caused.

    j) Costs and Expenses:

       i. Award Plaintiffs their reasonable costs and expenses incurred in pursuing this action, including court fees, filing fees, and any associated costs.

    k) Other Relief:

       i. Grant any such other relief as the Court may deem just, equitable, and proper to ensure accountability for Defendants' misconduct, restore trust in U.S. financial markets, and prevent future harm to retail investors.

## VIII. <u>DEMAND FOR JURY TRIAL</u>

278. The Plaintiff hereby demands a trial by jury for all claims and issues triable as of right pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: 12/23/24

*Jennifer Vetrano*

Jennifer Vetrano, pro se ipso

25 Pond Hollow Lane

West Creek, NJ 08092

### CERTIFICATION OF PLAINTIFFS PURSUANT TO FEDERAL SECURITIES LAWS

I, Jennifer Vetrano, duly certify and say, as to the claims asserted under the federal securities laws, that I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on: 12/23/24

Signature: *Jennifer Vetrano*

Name: Jennifer Vetrano

NIFER VETRANO
) 783-0105
UPS STORE #0807
35
ROUTE 72 W
HAWKIN NJ 08050-2811

0.8 LBS LTR 1 OF 1
SHP WT: 1 LBS
DATE: 23 DEC 2024

P CLERK, US DISTRICT CLERK
: ROOM 222
.200 E WALL

MIDLAND TX 79701

TX 797 9-01

S EARLY                    1+

KING #: 1Z 0V1 9E0 15 4473 7006

G: P/P
URE REQUIRED

RECEIVED

DEC 17 2024

REF #: CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY
DEPUTY CLERK



Visit theupsstore.com to find a location near you.

**Domestic Shipments**
· To qualify for the Letter rate, UPS Express Envelopes may only contain correspondence, urgent documents, and/or electronic media, and must weigh 8 oz. or less. UPS Express Envelopes containing items other than those listed or weighing more than 8 oz. will be billed by weight.

**International Shipments**
· The UPS Express Envelope may be used only for documents of no commercial value. Certain countries consider electronic media as documents. Visit ups.com/importexport to verify if your shipment is classified as a document.
· To qualify for the Letter rate, the UPS Express Envelope must weigh 8 oz. or less. UPS Express Envelopes weighing more than 8 oz. will be billed by weight.

**Note:** Express Envelopes are not recommended for shipments of electronic media containing sensitive personal information or breakable items. Do not send cash or cash equivalent.

Apply shipping documents on t

Do not use this envelope for:

UPS Ground®
UPS Standard®
UPS 3 Day Select®
UPS Worldwide Expedited®

Visit theupsstore.com to lea about our Print & Business S

P: ORANGE S: SOUTH
EAMS-2141
1Z0V19E0154473
7006

CLERK, US DISTRICT CLERK
200 E WALL ST
STE 222
MIDLAND TX 79701



THE UPS ST



THE UPS STORE®

Print & Business Services

*Express* Envelope