IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN TEXAS
MIDLAND-ODESSA DIVISION

| | |
|---|---|
| JENNIFER VETRANO,<br><br>*Plaintiff,*<br><br>v.<br><br>JOHN BRDA,<br>ALLISON CHRISTILAW, MBA, ICD.D B,<br>JOHN R. HARDING, UZI SASSON,<br>DAN EATON ESQ, MAURICE GUITTON,<br>ERIC M. LESLIE, PHILIPPE MORALI,<br>KEN HANNAH, STEEN KARSBO,<br>JOHN DOES 1-20, JANE DOES 1-20<br><br><br>*Defendants.* | Case No.: 7:24-CV-00325-DC-RCG<br><br>FILED<br>MAR 31 2025<br>CLERK, U.S. DISTRICT CLERK<br>WESTERN DISTRICT OF TEXAS<br>BY_____ DEPUTY |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Jennifer Vetrano submits this memorandum in opposition to Defendant Uzi Sasson's Motion to Dismiss for lack of jurisdiction and standing. For the reasons set forth below, the motion should be denied.

I. PERSONAL JURISDICTION IS PROPER OVER DEFENDANT

Defendant's claim that this Court lacks personal jurisdiction over him is without merit. As a corporate officer of Meta Materials Inc. ("Meta"), Defendant purposefully directed substantial activities toward Texas, and this suit arises from those contacts. Under Federal due process

1 | Page

standards, Plaintiff need only make a prima facie showing that Defendant has "minimum contacts" with Texas such that maintaining the suit does not offend traditional notions of fair play and substantial justice.

Texas-Focused Corporate Activities: Defendant purposefully availed himself of the benefits of conducting activities in Texas through his leadership role in Meta's merger with Torchlight Energy Resources, a Texas-based oil and gas company, and the management of the Orogrande oil assets in Texas. While serving as Meta's Chief Financial Officer ("CFO") and Chief Operating Officer ("COO") (April 2023-November 2023) and later as President and Chief Executive Officer (November 2023-August 7, 2024), Defendant oversaw corporate strategies and communications centered on Texas assets. Sasson strategically benefited from Texas-based corporate transactions including the merger with Texas-based Torchlight Energy Resources. These corporate activities establish sufficient contacts for jurisdiction in Texas. (Michiana Easy Livin' Country, Inc. v. Holten, 168 S.W.3d 777).

Meta's successor oil company, Next Bridge Hydrocarbons ("Next Bridge"), is headquartered in Midland, Texas, and Plaintiff—as a holder of Meta's Series A preferred stock (MMTLP) that converted into Next Bridge shares—has an ownership interest in a Texas-based enterprise. By directly managing and making decisions about these Texas-centered operations Defendant established sufficient minimum contacts with Texas. It is well-settled that even non-resident corporate agents may be subject to jurisdiction when they personally direct activities at the forum that give rise to the litigation. Here, Texas was the "focal point" of Defendant's conduct and of the harm suffered by shareholders Defendant's decisions impacted Texas assets (the Orogrande project) and Texas investors (including Next Bridge shareholders). Notably, he

2 | P a g e

withheld a promised Next Bridge Hydrocarbons investor presentation from shareholders for over two years (as detailed below), directly affecting shareholders of a Texas company.

Specific Jurisdiction (Purposeful Direction of Tortious Conduct): This lawsuit alleges that Defendant breached his fiduciary duties—a tort claim—through actions and omissions expressly aimed at Texas-based interests. Under the "effects" test of Calder v. Jones, a defendant's intentional conduct calculated to cause injury in the forum establishes jurisdiction.
He also failed to act on evidence of illegal stock manipulation that was harming a large number of Texas-based shareholders. These intentional omissions had foreseeable consequences in Texas, meaning Defendant "expressly aimed" his conduct at Texas and caused the brunt of the injury there.

Texas courts have a strong interest in adjudicating disputes involving the mismanagement of Texas-based corporate assets and the protection of Texas investors. Requiring Defendant to defend in Texas is fair and comports with due process. No "Fiduciary Shield" from Jurisdiction: Defendant cannot avoid jurisdiction by claiming he acted only in a corporate capacity. Courts do not permit corporate officers to hide behind the corporate shield when they are sued for their own tortious conduct directed at the forum. The Fifth Circuit recognizes that while a person's status as a corporate officer alone does not create jurisdiction, an officer is subject to personal jurisdiction for wrongful acts for which he is personally liable.

Here, Plaintiff alleges that Defendant himself committed tortious breaches of fiduciary duty. Those claims are directed at Defendant individually, not merely at the corporation.

Accordingly, his Texas contacts in carrying out or failing to carry out his duties can be attributed to him for jurisdictional purposes . As the Supreme Court has instructed, an employee's or officer's "status as an employee does not insulate them from jurisdiction" when their own forum-related acts are at issue. Defendant's deliberate inaction and decisions in Texas-related matters are at the heart of this suit, so he must answer for them in Texas.

Exercising jurisdiction over Defendant in Texas is also reasonable. The burden on Defendant (a high-ranking officer who engaged with Texas businesses) is minimal compared to Texas's interest in providing a forum for wronged investors. Plaintiff's choice of forum is entitled to deference, particularly since a significant part of the relevant conduct occurred in or was directed at Texas. Defendant's actions were closely tied to Texas assets and transactions, and Texas has a strong interest in adjudicating corporate governance disputes that affect its local economy and residents. Defendant's Texas contacts and the nexus of this dispute with Texas make jurisdiction not only proper but essential to avoid allowing Defendant to escape accountability through forum gamesmanship.

II. PLAINTIFF FIAS INDIVIDUAL STANDING (DIRECT, NOT DERIVATIVE, CLAIM)

Defendant also seeks dismissal by arguing that Plaintiff's claims are derivative in nature or that she otherwise lacks standing to sue in her own right. This argument mischaracterizes the Complaint. Plaintiff asserts personal injuries are distinct from any general harm to the corporation, and thus she has standing to pursue her claims individually. Article TIT Standing: At the outset. Plaintiff meets the constitutional minimum for standing. She has suffered an injury-in-fact: the loss of the value and liquidity of her investment, and the deprivation of critical

information and opportunities as a shareholder, all as a direct result of Defendant's alleged breaches. This injury is concrete, particularized, and actual—Plaintiff held Meta's preferred shares (MMTLP) that were converted into Next Bridge stock, and she personally experienced a diminishment in the value and rights associated with those shares due to Defendant's conduct. The injury is also fairly traceable to Defendant's actions (for example, Defendant's failure to act on known market manipulation allowed the status quo harming shareholders to persist, and his withholding of the Next Bridge investor presentation kept Plaintiff in the dark) and would be redressed by a favorable court decision (through damages or other relief). Plaintiff therefore satisfies the case-or-controversy requirement of Article III (Lujan V. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

     Direct vs. Derivative Injury: The core of Defendant's standing challenge is the contention that Plaintiff's grievances belong to the corporation (Meta Materials) or its bankruptcy estate, not to her personally. It is true that generally shareholders cannot recover personally for injuries that are actually injuries to the corporation as a whole, such as a decline in stock price or corporate asset value (Wingate v. Majdik, 795 S.W.2d 717, 719 (Tex. 1990)). In such cases, any lawsuit must be brought derivatively on behalf of the corporation. However, Plaintiff's claims here fall into the category of direct injuries to a shareholder. Courts look to the nature of the harm: if the shareholder's injury is independent of any injury to the corporation, the claim is direct; if it merely derives from a corporate injury (like the corporation's assets being diminished), it is derivative. The Fifth Circuit has explained that "as long as the injury a [shareholder] is pursuing

5 | P a g e

does not stem from the depletion of corporate assets, the injury is a direct one that does not belong to the estate" (albeit stated in the context of a bankruptcy creditor, the principle equally applies to shareholders).

Here, Plaintiff alleges injuries that did not stem from the depletion of Meta's corporate assets, but rather from violations of duties owed directly to her and other shareholders. Several aspects of Defendant's misconduct were targeted at shareholders' rights (and informational interests) rather than at the corporate entity alone. For example. Defendant's two-year withholding of the Next Bridge Hydrocarbons investor presentation harmed the shareholders by denying them important information about the company they owned (Next Bridge). This was not an injury to Meta Materials as a corporation—Meta's balance sheets were unaffected by whether shareholders saw the Next Bridge presentation. Instead, the injury was borne directly by the shareholders (Plaintiff and about 65,000 others) who were "kept in the dark for months" about their investment, an act which one former Meta insider described as "kneecapping" shareholders and a "breach of fiduciary duties". Likewise, Defendant's failure to act on the market manipulation report potentially caused the loss of shareholders' personal claims or rights (such as legal claims for stock manipulation that may have become time-barred). Indeed, an attorney familiar with the situation noted that the report was completed and given to Meta "months ago' and speculated that the decision to "sit on it" has allowed statutes of limitation to run on claims, an outcome that hurts the investors, not just the company. This loss of a chance to seek redress for a fraudulent market scheme is a distinct harm to shareholders themselves. In short. Plaintiff's injury is individualized ~ she suffered as a shareholder who was denied information and recourse

- and does not merely reflect a generalized harm to the corporation.

Furthermore, Plaintiffs relationship to Meta and Next Bridge is unique because of the corporate events at issue. Plaintiff became a shareholder of Next Bridge (a Texas corporation formed from Meta's spinoff) on December 14, 2022, when Meta's preferred shares (MMTLP) converted into Next Bridge stock. After that date. Plaintiff was no longer a Meta Materials stockholder, yet Defendant's actions as Meta's CEO in 2023-2024 had a direct impact on her interests as a Next Bridge shareholder. Meta's management (under Defendant) had possession of Next Bridge's investor presentation and other information important to Next Bridge's owners, but they refused to release it. In this sense, Defendant's duty of disclosure and fair dealing extended to the shareholders receiving the spinoff assets. Defendant chose a course that benefited Meta's insiders (and perhaps Meta's litigation strategy) at the direct expense of those shareholders' ability to understand and realize value from their Next Bridge holdings. Such an injury was not suffered by Meta Materials Inc. itself (which had no ongoing interest in Next Bridge after the spinoff) – it was suffered by Plaintiff individually. Courts have recognized that when corporate fiduciaries take actions during a merger or spinoff that directly affect shareholders' rights (as opposed to corporate assets), the shareholders may bring direct claims. See, e.g., Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1039 (Del. 2004) (shareholder may sue directly if the duty breached was owed "to the stockholder and not the corporation" and the stockholder suffered the harm).

Defendant will likely argue that Plaintiff's loss is simply the diminished value of Meta or Next Bridge, which normally would be a derivative harm. But this argument ignores the specific nature of Plaintiff's allegations. Plaintiff is not merely complaining that Meta's stock price

7 | P a g e

dropped; she is pointing to breaches of duties that directly affected her rights as a shareholder, such as the right to be informed and the right to have corporate officers act in good faith to protect shareholder interests when extraordinary wrongdoing (e.g. illegal short selling) was discovered. In other words, Plaintiff's lawsuit is not standing in the shoes of the corporation to recover corporate losses; it is enforcing her own rights that arose when Defendant failed to act as a faithful fiduciary to the shareholders. Notably, Meta Materials is now in Chapter 7 bankruptcy (Case No. 24-50792). Any claims belonging to Meta's estate will be handled by the bankruptcy trustee. But Plaintiff's claim for breach of fiduciary duty is separate: Meta (the corporation) itself, by all accounts, may not have suffered a distinct injury from the nondisclosure of the Next Bridge presentation or the delay in acting on the manipulation report - especially since Meta's value was largely wiped out in bankruptcy. By contrast, Plaintiff and other similarly situated investors suffered real losses that no bankruptcy distribution can remedy. (Equity shareholders of Meta are unlikely to receive anything from the Chapter 7 estate; meanwhile, Next Bridge shareholders still lack a public market or full information for their shares.) Absent this lawsuit.

Plaintiff has no avenue to recover for those personal losses. Equity investors are often left without recourse when a company fails due to mismanagement—except through a direct claim against the faithless fiduciary, if the law recognizes the injury as direct. Here, the Court should recognize Plaintiff's standing to sue Defendant directly; otherwise. Defendant's

alleged misconduct toward the shareholders would go unchallenged and unremedied. Finally, Plaintiff's standing is reinforced by the fact that she has also experienced individualized treatment by Defendant's agents that distinguishes her from shareholders at large. Specifically, in March 2025 Plaintiff received an unwarranted and overly broad litigation hold notice from the law firm Christian Attar (headed by attorney James "Wes" Christian) demanding that she preserve "all documents" related to MMTLP dating back to 2018. Christian Attar was the very firm Meta retained under Defendant's tenure to investigate stock manipulation, and it has since been engaged by Next Bridge (Exhibit B). Plaintiff acquired her shares in 2022, so a demand to produce documents going back to 2018 had no legitimate basis related to her. She perceived this as a targeted act of intimidation or retaliation connected to her filing of the present lawsuit. In response, Plaintiff lodged an ethics complaint with the State Bar of Texas regarding this conduct (Exhibit C). In the current Meta Materials bankruptcy case, the estimated budget for the expenses of litigation is $11,800,000 (the commitment) consisting partially on contingency and then arrangements for payment of third party expenses related to the litigation up to the amount of the commitment. James "Wes" Christian of Christian Attar was one of two of the attorneys that made an agreement with Christina W. Lovato in her capacity as chapter 7 trustee of the estate of META MATERIALS INC (Exhibit M). On March 26, 2025 James "Wes" Christian sent another Demand for Preservation of Electronically Stored Information over the X platform

messaging system to the Plaintiff's X account @fearles59324823 the Plaintiff felt that this was another tactic for intimidation, harassment, and attempt to silence her. (Exhibit C).

This sequence of events underscores that Plaintiff is not simply one shareholder among many suffering a diffuse injury; rather, she was personally subjected to harassment. This is a further particularized injury (chilling and burdening her exercise of legal rights) flowing from Defendant's actions. It underscores her stake in this matter and the propriety of allowing her to seek relief in her own name.

In sum, Plaintiff has individual standing to pursue her claims. She alleges concrete, particular harms to her interests as a shareholder, causally linked to Defendant's conduct and redressable by this Court. Her claims are direct, not derivative: they seek to vindicate her own rights and obtain relief for her own injuries, rather than recover for Meta's losses. The Court should reject Defendant's attempt to cast this as a derivative shareholder suit. At the very least, the nature of the harm involves factual questions that should not be resolved in Defendant's favor on a answer motion. Plaintiff has sufficiently alleged standing, and the motion to dismiss on that ground should be denied.

III. DEFENDANT'S BREACHES OF FIDUCIARY DUTY ARE ADEQUATELY PLED

A. Legal Standard for Breach of Fiduciary Duty:

To survive a Rule 12(b)(6) motion to dismiss, a complaint need only contain enough factual matter, accepted as true, to state a claim for relief that is plausible on its face. The Court does not require detailed factual allegations or "heightened" pleading of specifics; it is enough that Plaintiff pleads facts sufficient to raise a reasonable expectation that

discovery will reveal evidence of the claim. In assessing the complaint, the Court must accept all well-pleaded facts as true and draw all reasonable inferences in Plaintiff's favor. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Here, Plaintiff—proceeding pro sehas laid out a detailed chronology of Defendant's actions and omissions, supported by references to documents and communications (Exhibits A-N). These factual allegations easily clear the plausibility threshold and state a claim for breach of fiduciary duty under applicable law. Under corporate law (applying Texas law, as the forum state), corporate officers owe fiduciary duties of loyalty, care, and good faith to the corporation and, by extension, to its shareholders. In Texas, for instance, it is explicitly recognized that "corporate officers and directors have specific fiduciary duties to shareholders," including the duty of loyalty (to put the company's interests above their own) and the duty of care (to act with due diligence and prudence). A breach of fiduciary duty occurs when the officer or director fails to act in accordance with these obligations, resulting in harm to the company or its shareholders. The elements of a breach of fiduciary duty claim are; the existence of a fiduciary duty, a breach of that duty by the defendant, and injury to the plaintiff or benefit to the defendant as a result of the breach. Plaintiff's complaint explicitly addresses each element.

Existence of Duty: Defendant, as CFO/COO and later CEO of Meta, unquestionably owed fiduciary duties. lie was a top executive entrusted with the management of the company's affairs. This position created a relationship of trust and confidence between him and the company (and its shareholders) imposing the highest duties known to law. There is no dispute that during his tenure (April 2023 - August 2024), Defendant had fiduciary duties of loyalty, care, and disclosure. Notably, by late 2023 into 2024, Meta was in a precarious financial condition (80%

workforce reduction, contemplating bankruptcy, which meant Defendant's decisions would profoundly affect shareholders and possibly creditors). He was required to act with complete candor, integrity, and good faith.

Breach of Duty: Plaintiff alleges multiple breaches by Defendant during his time in control, each one a violation of the duty of loyalty and/or care. These breaches can be summarized in three main categories, all supported by specific factual allegations and exhibits including concealing and Failing to Act on the Stock Manipulation Investigation: In mid-2023, Meta (under Defendant's financial leadership) initiated an investigation into potential illegal short selling and market manipulation affecting Meta's stock (MMAT) and its preferred dividend stock (MMTLP). Meta engaged Shareholder Intelligence Services ("ShareIntel") to gather trading data and then retained the law firms Christian Attar and Warshaw Burstein to evaluate and pursue claims . By Q4 2023, according to Meta's founding CEO George Palikaras, the company had received a draft investigative report confirming meritorious claims of market manipulation. Meta's own Board Chairman, Jack Harding, publicly stated that the company was "equipped with the necessary information to act" and expected to file legal proceedings "in the coming quarters" against those responsible (Exhibit A and B). Despite this, no action was ever filed under Defendant's leadership. Instead, the report was effectively

shelved. (Exhibit A).   On April 1, 2024, attorney Mark Basile (who represents shareholders in a related case) revealed on social media that he knew the report was finished and provided to Meta "months ago," and that Meta paid a lot for it but was "sitting on it" . Basile speculated that "even fraud has [statute of limitations] periods" and that "Wes [Christian] was told to stand down and NOT file anything", despite presumably wanting to (Exhibit D). In response, Meta's former CEO Palikaras essentially confirmed this, noting there "should be no reason why MMAT would sit on it unless funding for litigation was an issue, and that with Defendant's "impeccable track record" the case would be a "slam dunk" if pursued (Exhibit E). Palikaras further lamented that "critical facts... were kept under wraps for reasons unknown". (Exhibit F) (Exhibit G) (Exhibit H). These statements strongly indicate that Defendant knowingly chose inaction in the face of a viable, important legal claim that could have benefited the company and its shareholders. Such a decision is not protected by any business judgment rule if it was made in bad faith or out of disloyal motives.

Plaintiff alleges it was: Meta's bankruptcy filings show that in October 2024 (after Defendant's tenure), the Chapter 7 trustee reached an agreement to pursue the litigation with a hefty $11.8 million budget (Exhibit M). In other words, Defendant left the issue for the bankruptcy process, rather than acting when it could have helped shareholders directly. This delay likely diminished the claims' value (due to time and the intervening bankruptcy) and left shareholders like Plaintiff with no remedy in the interim. Failing to act on known wrongdoing that was harming the corporation, and its shareholders can be a breach of the duty of care (if grossly negligent) or of loyalty (if motivated by improper considerations). Here, Plaintiff's allegations permit an inference that Defendant's decision to "sit on" the report was made in bad faithperhaps to avoid personal or corporate embarrassment, or to maintain the illusion of corporate viability until

insiders could secure payouts (as discussed below). By withholding material information about the manipulation findings, Defendant also breached the duty of candor which is part of the duty of loyalty. Shareholders were entitled to honesty about the status of the investigation, yet no disclosure was made from June 2023 through the end of Defendant's tenure. Instead, shareholders heard only vague assurances in press releases that Meta was "equipped" to act, while in reality Defendant never intended to initiate action before bankruptcy. Such conduct falls outside the protection of the business judgment rule because it plausibly involved "inaction" in the face of a known duty to act (sometimes called a Caremark claim for failure of oversight) or an intentional dereliction of duty. At the pleading stage, this is sufficient to allege a breach of fiduciary duty.

The Defendant withheld the Next Bridge Investor Presentation and other communications. Defendant is alleged to have intentionally kept Next Bridge shareholders uninformed, which is a direct violation of the duty of loyalty's requirement of fair dealing with shareholders. After the spinoff in December 2022, Next Bridge Hydrocarbons (holding the Orogrande assets in Texas) was a private company wholly owned by the former holders of MMTLP. Meta's management had prepared a detailed Next Bridge investor presentation deck by March 2024, which was promised to shareholders, but it was never released. According to Mr. Palikaras, this was due to a "directive from the new governance structure" (i.e.. Defendant and those aligned with him) that imposed an extremely conservative communication policy, "significantly restricted the ability to share insights" and specifically resulted in the Next Bridge presentation never being delivered despite having a complete presentation ready to go (Exhibit G). Palikaras made clear that this was not a matter of oversight but a conscious decision by Defendant's regime to withhold information. In June 2024, Palikaras further observed publicly that Meta was being dismantled

"before our eyes" and that "we have been kept in the dark for months", which in his opinion "does not benefit anyone and is a breach of fiduciary duties" (Exhibit H). This powerful statement by Meta's former leader underscores that insiders themselves viewed the silence and secrecy as a betrayal of shareholders' trust. By keeping the Next Bridge shareholders "in the dark," Defendant breached the fiduciary duty of candor and disclosure that corporate officers owe when communicating (or choosing not to communicate) with shareholders. Shareholders had a right to that investor presentation, which likely contained crucial information about Next Bridge's assets, plans, and valuation. Without it, Plaintiff and others could not make informed decisions or effectively assert their rights (for instance, lobbying for corporate action or seek buyers for their shares). Defendant's decision to withhold the presentation for over two years (from the spinoff through at least the end of his tenure in August 2024) was not in good faith. It served no legitimate purpose for shareholders; rather, it appears to have been in furtherance of Defendant's strategy to control the narrative and perhaps avoid triggering shareholder activism or legal action. By pleading these facts, Plaintiff has alleged an intentional breach of the duty of loyalty (which includes the duty to disclose material information). If proven, no protection or justification would excuse such conduct, as it directly undermines the fundamental duty of an officer to act with transparency and fairness toward the owners of the company.

Plaintiff also alleges that Defendant enriched himself at the company's expense while shareholders were left with nothing. which raises a classic breach of the duty of loyalty via self-dealing or waste. In Meta's bankruptcy filings (Case No. 24-50792), it was disclosed that on August 9, 2024, just as the company was collapsing, Defendant signed an "Official Form 207 (Exhibit J) detailing insider compensation. This included a $100,000 consulting agreement payment to Ddalcom LLC for the benefit of Uzi Sasson, as well as Defendant's own salary,

severance, and vacation payouts totaling $689,745.31. In total, insiders of Meta received over $8.18 million in the year leading up to bankruptcy. Defendant executed these documents on August 9, 2024—two days after August 7, 2024, which is the date he claims his employment ended (Defendant inconsistently represented in his motion papers that he was employed only until August 7). (Exhibit N). The timing and amounts indicate that Defendant saw to it that he was paid handsomely on his way out, even as the company was preparing to file for Chapter 7 and shareholders' equity was being wiped out. Approving large payouts to oneself and other insiders on the eve of bankruptcy is highly suspect; it suggests a conflict of interest between Defendant's personal financial interest and the interests of the company's creditors and shareholders. If proven that these payments were improper or excessive, it would constitute a breach of the duty of loyalty (and possibly fraudulent conveyances, though those are not Plaintiff's claims here). At minimum, it bolsters Plaintiff's claim that Defendant prioritized his own gain over the shareholders' interests. A fiduciary "cannot put their self-interest ahead of the company", yet Defendant did exactly that by extracting value for himself when the company was insolvent.

Additionally, Defendant's lack of candor is evident in another way: he made a sworn Declaration (Exhibit L) on March 20, 2025, submitted to this Court, asserting under penalty of perjury that he was served with the complaint on February 27, 2025. In fact, the proof of service shows he was personally served on February 26, 2025 (Exhibit K). While this discrepancy of one day may seem minor, it demonstrates a willingness to misstate facts to the Court. Such behavior casts doubt on Defendant's credibility and by extension suggests he may not have acted honestly with shareholders either. In a fiduciary duty case, credibility and trust are central. The

plaintiff contends that just as Defendant was not truthful about service of process, he was not truthful or forthcoming about Meta's condition and plans while he was in charge.

Defendant claims that he joined Meta long after some of the events (like the initial market manipulation in 2021-2022) and therefore cannot be responsible for the harm that resulted. Plaintiff readily acknowledges that Defendant did not cause the origination of the MMTLP trading halt or the short selling issue; rather, her claim is that Defendant inherited a situation requiring faithful stewardship and failed that responsibility. The Complaint focuses squarely on the period of Defendant's tenure. It chronicles what he did (or failed to do) from April 2023 onward. The fact that the underlying problem (naked short selling of the stock) began before Defendant's arrival does not absolve him—if anything, it presented him with an opportunity to prove his loyalty to shareholders by taking corrective action. His failure to do so is the crux of the claim. Moreover, some of the harmful events did occur entirely on Defendant's watch: e.g.. the company's slide into bankruptcy and the final decision not to communicate with shareholders. Plaintiff is not suing Defendant for what happened before he came to Meta; she is suing for how he responded (or failed to respond) to the challenges once they were his to manage. His own counsel's statement that "Mr. Sasson joined Meta years after the alleged conduct occurred" is a red herring. The alleged misconduct in this lawsuit is what Mr. Sasson did during his time in control, not the initial shorting scheme. Plaintiff's opposition makes this clear, and any contrary suggestion is a misreading of the Complaint.

In light of the above. Plaintiff has more than met her pleading burden. If proven true,

Defendant's breaches of fiduciary duty caused Plaintiff to suffer financial loss (her Next Bridge shares are effectively frozen and possibly diminished in value, and she lost the opportunity for any timely legal remedy for the trading fraud) and other harms (stress, the burden of dealing with multiple harassing legal notices, etc.). These are real damages attributable to Defendant's breaches.

Plaintiff seeks compensatory damages for her losses, as well as any equitable relief the Court deems appropriate (for example, disgorgement of the compensation Defendant took while acting disloyally, or an accounting of what happened to the ShareIntel report and related funds). Because Meta is in bankruptcy, any recovery for Plaintiff will not adversely affect the company or other creditors; it will solely compensate Plaintiff for her individual injuries. Thus, granting relief in this case aligns with equitable principles and does not risk double recovery or conflict with the bankruptcy estate.

Plaintiff respectfully urges the Court to allow her the chance to prove her case. If the Court harbors any doubts about the clarity of the pleadings, Plaintiff stands ready to replead with more specificity—however, given the extensive detail already provided, Plaintiff submits that her current pleadings are more than sufficient to withstand a Rule 12(b)(6) or 12(b)(1) challenge. As a pro se litigant, she has poured considerable effort into articulating her claim; justice would be served by adjudicating it on the merits.

IV. CONCLUSION

For the foregoing reasons. Plaintiff respectfully requests that the Court DENY Defendant's Motion to Dismiss in its entirety. Plaintiff has established a prima facie case for personal jurisdiction and demonstrated her standing to bring direct claims. She has also stated a valid claim for breach of fiduciary duty under federal pleading standards. Accordingly, this case should be allowed to proceed. Plaintiff further requests any additional relief that the Court deems just and proper under the circumstances.

Respectfully submitted.

/s/ Jennifer Vetrano

Jennifer Vetrano (Pro Se)

25 Pond Hollow Lane

West Creek, NJ 08092

Email: JVetrano999@gmail.com

Plaintiff, Pro Se

Certificate of Service: I hereby certify that on March 28, 2025, a true and correct copy of the foregoing document was sent via email to John Russell Hardin, counsel for Defendant, at JohnHardin@perkinscoie.com, in compliance with the Federal Rules of Civil Procedure.