**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WESTERN TEXAS**
**MIDLAND-ODESSA DIVISION**

JENNIFER VETRANO,

    *Plaintiff,*

    v.

JOHN BRDA,
ALLISON CHRISTILAW, MBA, ICD.D B,
JOHN R. HARDING, UZI SASSON,
DAN EATON ESQ, MAURICE GUITTON,
ERIC M. LESLIE, PHILIPPE MORALI,
KEN HANNAH, STEEN KARSBO,
JOHN DOES 1-20, JANE DOES 1-20

    *Defendants.*

Case No.:  7:24-CV-00325-DC-RCG

**FILED**

MAY 01 2025

CLERK. U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                DEPUTY

<u>**PLANTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT JOHN R. HARDING'S**</u>

<u>**TO MOTION TO DISMISS UNDER RULES 12(b) AND 12 (b)(6)**</u>

**I. INTRODUCTION**

Defendant John R. Harding's Motion to Dismiss must be denied in its entirety. As Chairman of

the Board of Meta Materials Inc. ("META") during critical periods of misconduct and

shareholder harm, Harding now seeks to evade accountability by asserting defective personal

jurisdiction and standing defenses—each of which fails under established law.

Plaintiff's 69-page Complaint alleges in granular detail that Harding breached his fiduciary

duties through acts and omissions directly tied to material shareholder injuries. These include his

failure to intervene amid well-documented trading irregularities in MMTLP, the unchecked proliferation of synthetic shares, misleading shareholder communications, and his acquiescence in the transfer of oil-and-gas assets into Next Bridge Hydrocarbons ("NBH")—a private Texas-based entity controlled by insiders. These actions are not abstract policy matters; they inflicted concrete and particularized harm on Plaintiff and thousands of similarly situated shareholders. See *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (a claim is plausible on its face where the complaint "nudge[s] their claims across the line from conceivable to plausible").

Harding's role as Chairman was publicly announced by META's CEO in August 2022, placing him squarely in command during the period surrounding the December 2022 MMTLP trading halt, when hundreds of millions of dollars in retail investor value were frozen overnight. Simultaneously, Harding oversaw the opaque asset spinout into NBH, a transaction riddled with conflicts and executed without appropriate shareholder disclosure. See *Exhibit A*. Notably, META publicly acknowledged on June 27, 2023, that it retained Shareholder Intelligence Services, LLC to investigate "illegal naked short selling," and later employed the securities law firms Christian Attar and Warshaw Burstein to examine evidence of stock manipulation. See *Exhibit B*. In a May 20, 2024 press release, META reported that counsel had concluded there were "meritorious claims for market manipulation" and pledged to initiate legal proceedings. Harding himself stated: "We are now equipped with the necessary information to act… and expect to file legal proceedings in the coming quarters against the responsible financial service firms." Yet Harding took no internal governance actions to protect shareholder interests, initiate board-level remedies, or disclose material risk factors—constituting a dereliction of duty and breach of the fiduciary obligations owed to shareholders.

Harding's conduct is subject to this Court's jurisdiction under the "effects test" articulated in *Calder v. Jones*, 465 U.S. 783, 789–90 (1984), which holds that personal jurisdiction exists where the defendant's intentional acts are expressly aimed at the forum state and cause foreseeable harm. Harding presided over corporate decisions that materially affected Texas-based assets and injured shareholders within and beyond the forum. His involvement in the NBH transaction, tied to assets in the Orogrande Basin of Texas and facilitated through Meta's predecessor Torchlight Energy, further anchors jurisdiction under applicable precedent.

Plaintiff's claims are direct and personal, not derivative of corporate harm, and thus are not barred by the automatic stay in Meta's bankruptcy proceedings. See *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 586 (5th Cir. 2008) ("a shareholder may bring a direct action where the alleged injury is distinct from that suffered by the corporation").

Accordingly, and as further set forth below, Harding's Motion to Dismiss should be denied in full.

## II. PERSONAL JURISDICTION IS IRREFUTABLY ESTABLISHED

Defendant John R. Harding's assertion that this Court lacks personal jurisdiction is legally defective and factually contradicted by well-established precedent. Plaintiff's Complaint alleges conduct by Harding that was expressly aimed at the State of Texas and that caused foreseeable harm to Texas-connected shareholders, satisfying both constitutional due process and Fifth Circuit authority. The exercise of jurisdiction is proper under Federal Rule of Civil Procedure 12(b)(2) and controlling authority including *Calder v. Jones*, 465 U.S. 783 (1984), and *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).

**A. Harding's Minimum Contacts with Texas Are Substantial and Intentional**

To establish specific personal jurisdiction, a plaintiff must show that the defendant purposefully directed activities at the forum state and that the claim arises from or relates to those contacts. *Burger King*, 471 U.S. at 472–73. Here, Harding's contacts with Texas are not incidental—they are substantial, intentional, and causally related to the harm alleged.

Harding served as Chairman of Meta Materials' Board from August 2022 through August 2024. During that time, Meta governed legacy assets inherited from Torchlight Energy Resources, a Texas-headquartered oil and gas company based in Plano, with long-standing operations throughout the state. See Compl. ¶¶ 43–91; Exhibits C–E. These operations included the Orogrande Project in Hudspeth County (134,000 net acres), the Hazel Project in Sterling, Tom Green, and Irion Counties, and additional holdings in Winkler County, Exhibit K.

Harding's role as Chairman gave him oversight of the strategic governance of these assets—including their controversial transfer to Next Bridge Hydrocarbons (NBH), a Texas-incorporated entity. This transaction lies at the heart of Plaintiff's claims. Notably, Meta Materials' own SEC-filed prospectus (Form 424B4, Nov. 18, 2022) confirms that oil and gas leases held by Torchlight Hazel LLC and Hudspeth Oil Corp—both Texas-based—were transferred to NBH as part of a non-cash distribution:

> *"Meta has not sold to a third party any assets related to the historical oil and natural gas business and has transferred the subsidiary companies, the holders of the oil and natural gas assets, to us prior to the Spin-Off."*
> — *Prospectus (Form 424B4), Next Bridge Hydrocarbons, Inc., Nov. 18, 2022*

Between 2021 and 2023, MMAT (formerly Torchlight) had financed drilling and operating activities in the Orogrande Basin through significant intercompany loans. These debts were never repaid in cash but absorbed into NBH's private asset structure.

As one analyst noted, "Greg McCabe, former Chairman of Torchlight, ended up with 100% ownership of Next Bridge." See Keubiko, *MMTLP: Valuing the Non-Cash Distribution* (May 12, 2023). This material related-party transaction was executed under Meta's governance structure—during Harding's chairmanship—and was never disclosed or objected to by Harding. His failure to investigate or oppose this insider enrichment constitutes a breach of fiduciary duty under *Stone v. Ritter*, 911 A.2d 362 (Del. 2006), and *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745 (Del. Ch. May 3, 2004). And because the transaction involved Texas-based leases, a Texas-based entity, and a Texas-resident beneficiary, the harm was foreseeably felt in Texas—thus satisfying the purposeful availment requirement under *Burger King* and the effects test under *Calder*, 465 U.S. at 789–90.

Harding cannot insulate himself from jurisdiction by disclaiming physical presence in Texas. It is well-settled that physical presence is not required where the defendant "deliberately reached out" beyond his home state to conduct business or exercise control over matters affecting the forum. *Burger King*, 471 U.S. at 476. The Fifth Circuit has consistently held that "even a single substantial act directed toward the forum state that gives rise to a cause of action can support personal jurisdiction." *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001).

Harding's invocation of the fiduciary shield doctrine is also unavailing. That doctrine does not apply when the officer is personally involved in the misconduct directed at the forum state. See *Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985) ("The fiduciary shield doctrine does

not shield an individual from jurisdiction when the individual's personal acts create the requisite contacts."). Harding's failure to act in the face of a major insider asset transfer—one materially impacting shareholders and the Texas economy—easily meets this standard.

## B. Harding's Conduct Caused Foreseeable Injury in Texas

The second prong of the jurisdictional analysis—whether the claims arise from the defendant's forum-directed activities—is satisfied here. *Walden v. Fiore*, 571 U.S. 277, 284 (2014). Harding's leadership over Meta during the MMTLP halt, the transfer of Texas-based oil assets to NBH, and his concealment of internal investigations into illegal trading practices all directly impacted shareholders with Texas ties.

Public announcements made during Harding's tenure touted Meta's retention of Christian Attar LLP and Shareholder Intelligence Services to investigate stock manipulation. Yet internally, no meaningful board-level action followed. See Compl. ¶¶ 255–268. The resulting investor harm—financial, reputational, and informational—was concentrated in a shareholder base heavily tied to Texas and Torchlight's legacy operations. This is precisely the kind of "express aiming" contemplated by *Calder*, 465 U.S. at 789–90.

## C. Exercising Jurisdiction Over Harding Is Fair and Reasonable

Exercising jurisdiction over Harding comports with fair play and substantial justice. *Burger King*, 471 U.S. at 476–77. The relevant factors strongly favor jurisdiction:

- **Burden on the Defendant**: Harding voluntarily assumed leadership over a company with extensive Texas operations. Litigating in Texas is neither unforeseeable nor unduly

burdensome.

- **Forum State's Interest**: Texas has a compelling interest in adjudicating claims arising from misconduct affecting its land leases, royalty payments, and investor base *Exhibit G*.

- **Plaintiff's Interest**: Plaintiff seeks redress for harm sustained through securities linked to Texas-based assets.

- **Judicial Efficiency**: The forum is closely connected to the underlying facts and entities involved.

- **Public Policy**: Texas has a strong interest in ensuring corporate fiduciaries are held accountable for decisions affecting its residents and resources.

As the Fifth Circuit held in *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 433 (5th Cir. 2014), jurisdiction does not hinge on whether the defendant "set foot in the forum," but whether he "purposefully directed" actions toward it. Harding's failure to intervene in an undisclosed transfer of Texas-held oil assets—coupled with his subsequent concealment of naked short selling investigations—constitutes purposeful conduct expressly aimed at Texas, satisfying *Calder* and *Burger King* alike.

Harding's argument that Meta Materials' Nevada incorporation shields him from Texas jurisdiction ignores the substance of the conduct. Courts look past corporate formalities when

real-world conduct and consequences are forum-centered. See *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 539 (5th Cir. 2019).

## D. In the Alternative, Jurisdictional Discovery Is Appropriate

Should the Court have any doubt as to the sufficiency of Plaintiff's jurisdictional showing, Plaintiff respectfully requests limited discovery. See *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th Cir. 2005). Harding's self-serving declaration [Dkt. 47-1] fails to address key facts and corporate communications. Targeted discovery into Harding's role in the NBH transaction, board deliberations, and shareholder-facing decisions would provide further proof of his Texas-based contacts and fiduciary failures.

## III. PLAINTIFF'S CLAIMS ARE DIRECT AND HERS ALONE

Defendant Harding's argument that Plaintiff's claims are derivative and therefore belong to the bankruptcy estate of Meta Materials is legally untenable and factually incorrect. Plaintiff asserts personal, individualized injuries stemming from Harding's fiduciary breaches, including the deprivation of tradable securities, loss of market liquidity, and exposure to targeted harassment. These injuries are distinct from any harm suffered by Meta Materials as a corporate entity and are not subject to the jurisdiction or control of the bankruptcy estate.

## A. Plaintiff States Cognizable Direct Claims Under Controlling Law

A shareholder has standing to assert direct claims where the alleged injury is personal and not contingent upon injury to the corporation. See *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004) ("The issue must be who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the

recovery or other remedy."). The Fifth Circuit has adopted the same standard: "A shareholder's claim is direct when the injury suffered is unique and not derivative of a corporation's injuries." *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 586 (5th Cir. 2008).

Here, Plaintiff was individually harmed by Harding's knowing failure to act during confirmed trading anomalies and his concealment of material findings regarding illegal market activity. These omissions foreseeably deprived Plaintiff of the ability to trade her MMTLP securities, which were converted—without consent or compensation—into illiquid private equity. She also suffered reputational and emotional harm from retaliatory harassment connected to Meta insiders and its investor relations apparatus. See Compl. ¶¶ 23–25, 249–252. These are not generalized grievances—they are personal, concrete, and legally actionable.

The Delaware Supreme Court has expressly held that claims involving the dilution, expropriation, or destruction of a shareholder's voting power or tradable interest are direct in nature. *Gentile v. Rossette*, 906 A.2d 91, 99–100 (Del. 2006). The unique injury in *Gentile*—a controlling insider diverting value to himself through board-enabled mechanisms—closely parallels the facts here. The spin-off of NBH to insiders, during Harding's chairmanship, was a material, self-enriching transfer that extinguished Plaintiff's rights to participate in a public market. Such harm is not suffered by Meta—it is suffered directly by shareholders like Plaintiff.

## B. Plaintiff's Injuries Are Legally Distinct from Corporate Harm

Harding's reliance on bankruptcy court rulings concerning derivative claims—such as *In re Black Elk Energy Offshore Operations, LLC*, 2016 WL 4055044 (Bankr. S.D. Tex. 2016)—is inapposite. Plaintiff does not seek to recover for losses to Meta's balance sheet. She seeks compensation for three personal harms: (1) the forced conversion of her securities into a non-

tradable position; (2) the financial injury caused by her inability to liquidate shares; and (3) reputational damage from online retaliation.

Texas courts have repeatedly recognized that shareholders may assert direct claims when the harm is personal and not incidental to the corporation. See *Shirvanian v. DeFrates*, 161 S.W.3d 102, 110 (Tex. App. 2004) ("A shareholder may bring an action individually when he suffers an injury separate and distinct from other shareholders or the corporation.").

Moreover, Harding's fiduciary breach did not merely flow from inattentiveness—it was an actionable *failure of oversight* in the face of red flags. As the Delaware Supreme Court reiterated in *Marchand v. Barnhill*, 212 A.3d 805, 822 (Del. 2019), directors must implement systems to detect and address core business risks. Harding ignored those duties while serving as Chairman, even as the Board received notice of synthetic share proliferation, halted trades, and undisclosed asset transfers. His failure to act fits squarely within the framework of *Stone v. Ritter*, 911 A.2d 362 (Del. 2006), and supports personal liability for shareholder harm.

## C. Plaintiff's Claims Arise from Post-Bankruptcy, Independent Misconduct

Even assuming arguendo that any overlap existed between Plaintiff's injuries and Meta's estate, it would not extinguish her claims. The factual record confirms that Harding's actionable misconduct occurred after the conditions giving rise to bankruptcy had already materialized. Harding's relevant conduct—his failure to act during the December 2022 MMTLP trading halt, and his concealment of internal ShareIntel findings—occurred between August 2022 and August 2024. See Compl. ¶¶ 255–268. These acts are temporally and legally distinct from the Torchlight-Meta merger and the pre-merger liabilities underlying Meta's insolvency.

Courts have repeatedly held that shareholders retain standing to pursue claims for post-bankruptcy misconduct when the harm is personal. See *Parametric Sound Corp. v. Eighth Judicial District Court*, 401 P.3d 1100, 1107 (Nev. 2017) ("Shareholders retain standing to assert personal claims for injuries that are not derivative of the corporation's harm, even after insolvency."). Harding's misconduct was not aimed at Meta as a corporate entity—it targeted shareholders directly and suppressed transparency during a period of regulatory crisis. The claims arising from that misconduct are independent and fully justiciable.

Harding's attempt to reframe individualized harm as a corporate asset is both procedurally premature and substantively wrong. Plaintiff's claims are personal, direct, and timely—and no bankruptcy stay or trustee authority bars them.

## IV. PLAINTIFF'S CLAIMS ARE PLAUSIBLE AND DEVASTATING

Harding's Motion to Dismiss must be denied because Plaintiff's claims are pleaded with detailed, well-supported factual allegations that not only satisfy, but exceed the plausibility threshold required under Federal Rule of Civil Procedure 8(a). Plaintiff identifies specific acts and omissions by Harding that directly caused individualized harm, satisfying the standards set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

As the Supreme Court held in *Iqbal*, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." 556 U.S. at 678. Courts must accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor. *Twombly*, 550 U.S. at 555–56. Measured against these standards, Plaintiff's

claims are not merely plausible—they are devastating. They are substantiated by public statements, corroborating documents, and direct admissions from key witnesses.

## A. Plaintiff Alleges Specific, Actionable Misconduct by Harding

Harding's claim that the Complaint lacks particularized allegations is flatly contradicted by the record. Plaintiff alleges that, during his tenure as Chairman (August 2022 to August 2024), Harding owed fiduciary duties of care, loyalty, and good faith to shareholders. Despite those obligations, he:

- Failed to intervene amid known synthetic share proliferation affecting MMTLP securities;

- Took no action to protect shareholders during or after the December 2022 MMTLP trading halt;

- Publicly acknowledged internal investigations into naked short selling yet internally obstructed those efforts and concealed the results. See Compl. ¶¶ 255–268.

The most damning evidence comes from former CEO George Palikaras, who publicly identified Harding by name as the director who ordered legal counsel to shut down communications related to spoofing (pertaining to MMTLP and MMAT stock). On April 25, 2025, Palikaras stated on X:

> "I now have primary evidence showing that the Chairman of MMAT... directly asked Mr. Wes Christian NOT SPEAK to me regarding the spoofing case... The

board and/or management denied requests to act on the V2 report… Management

stated, 'You do not want to shake that tree.'"

When asked who that Chairman was, Palikaras responded unequivocally: **"Jack Harding."** [See

Exhibit H].

This is not benign neglect—it is willful suppression of material fraud data in violation of

fundamental fiduciary duties. As the Delaware Supreme Court held in *Stone v. Ritter*, 911 A.2d

362, 370 (Del. 2006), a director's "utter failure to attempt to assure a reasonable information and

reporting system exists" constitutes bad faith. Similarly, in *Marchand v. Barnhill*, 212 A.3d 805,

822 (Del. 2019), the court emphasized that directors must "make a good faith effort to put in

place a system of controls and monitoring." Harding's refusal to act on red-flag reports—while

publicly posturing as engaged—violated these standards and breached his duty of loyalty.

## B. Harding's Fiduciary Breaches Were Egregious and Deliberate

Harding's effort to frame his conduct as passive or indirect is belied by documentary and

testimonial evidence. Delaware law imposes a positive duty to act when corporate harm is

foreseeable and preventable. See *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66–67

(Del. 2006) (bad faith includes the "conscious disregard" of fiduciary duties).

Harding's inaction was not innocent:

- He failed to convene emergency board meetings in the wake of the MMTLP trading halt;

- He obstructed internal fraud investigations, instructing counsel not to collaborate with the CEO;

- He permitted Meta to make misleading public statements that falsely implied shareholder protections were underway. See [Ex. B].

These are not technical missteps—they are strategic omissions. As in *Abbott Labs*, 325 F.3d 795 (7th Cir. 2003), directors who deliberately ignore known risks expose themselves to liability for breach. Harding's failure to act on the V2 report and ShareIntel data—while publicly claiming vigilance—meets that threshold.

## C. Public Statements Demonstrate Harding's Knowledge and Complicity

Harding was not in the dark. As Chairman, he signed off on and publicly echoed Meta's highly visible campaign to investigate market manipulation:

- **June 27, 2023**: Meta announced it had retained Christian Attar LLP to investigate naked short selling (X post) [See Exhibit B];

- **June 29, 2023**: Meta expanded the effort, adding Warshaw Burstein LLP (X post);

- **May 20, 2024**: Meta claimed "significant progress" and promised legal action (X post) [Exhibit B].

Despite these representations, shareholders received no transparency, no action, and no access to ShareIntel data. Meanwhile, Harding received $113,333.33 in compensation upon departure [Exhibit J], and Meta quietly disclosed $30,000 in ShareIntel fees—without ever releasing findings. See [Exhibit J].

This public-private gap is not just misleading—it is legally actionable under *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001), where liability attaches for failure to correct misleading disclosures.

### D. Harding's Liability Is Reinforced by Coordinated Board-Level Misconduct

Harding's breach cannot be isolated from the collective dysfunction of Meta's Board. Defendants Sasson and Morali similarly failed to act and parroted coordinated defenses. As the Delaware Chancery Court held in *In re Emerging Commc'ns, Inc. Shareholders Litig.*, 2004 WL 1305745, at *38 (Del. Ch. 2004), directors are jointly liable where board-wide failures contribute to shareholder harm.

As Chairman, Harding bore heightened responsibility to initiate oversight and governance. His failure to enforce internal controls, demand transparency, or prevent fraudulent omission renders him personally liable and undermines the credibility of his defense.

## V. CONCLUSION

For the foregoing reasons, Defendant John R. Harding's Motion to Dismiss should be denied in its entirety.

Plaintiff has alleged specific and well-supported facts establishing this Court's personal jurisdiction over Harding under binding precedent, including *Calder v. Jones*, *Burger King Corp. v. Rudzewicz*, and *Lewis v. Fresne*. Plaintiff's claims are direct, personal, and entirely distinct from any derivative claims belonging to the bankruptcy estate of Meta Materials. The Complaint pleads actionable breaches of fiduciary duty, supported by detailed factual allegations that satisfy the pleading standards of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

The Complaint is not only well-pleaded—it is backed by verifiable public disclosures, insider communications, and statutory fiduciary duties long recognized under Delaware law. As the Fifth Circuit reiterated in *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002), "[m]otions to dismiss are viewed with disfavor and are rarely granted." Defendant Harding's Motion should meet the same fate.

To the extent the Court finds any jurisdictional uncertainty, Plaintiff respectfully requests leave to conduct narrowly tailored jurisdictional discovery to further establish Harding's contacts with the Texas forum and his post-merger fiduciary misconduct. See *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th Cir. 2005) ("When a plaintiff makes a preliminary showing of jurisdiction, discovery is warranted.").

Accordingly, Plaintiff respectfully prays that the Court:

- Deny Defendant Harding's Motion to Dismiss in its entirety;

- Grant Plaintiff leave to conduct jurisdictional discovery if needed.

- Request a hearing in this matter.

- Award such further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Jennifer Vetrano

Pro Se Plaintiff

April 30, 2025

Certificate of Service: I hereby certify that on April 30, 2025, a true and correct copy of the foregoing document was sent via email to John Russell Hardin, counsel for Defendant, at JohnHardin@perkinscoie.com, in compliance with the Federal Rules of Civil Procedure.

/s/ Jennifer Vetrano

15% Post-Consumer Content

**Note:** UPS Express envelopes are not recommended for shipments of electronic media containing sensitive personal information or breakable items. Do not send cash or cash equivalent.

• To qualify for the letter rate, the UPS express envelope must weigh 8oz or less. UPS express envelopes weighing more than 8 oz. will be billed by weight.

```
JENNIFER VETRANO                    2.2 LBS        PAK 1 0
(908) 703-0105                      SHP WT: 3 LBS
THE UPS STORE #0007                 DATE: 30 APR 2025
STE 35
297 ROUTE 72  W
MANAHAWKIN  NJ 08050-2811

SHIP CLERK, US DISTRICT CLERK
TO:  STE 222
     200 E WALL ST

     MIDLAND   TX  79701-5201
```



# TX 797 9-01

## UPS NEXT DAY AIR SAVER    1P
TRACKING #: 1Z 0V1 9E0 13 8684 1489



BILLING: P/P

REF #1: 3304

REF #2: 3304

KM4KGUJ4HY1R1 ISH 13.68C ZZP 450 18.5V 04/2025

SEE NOTICE ON REVERSE regarding UPS Terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and culture purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration regulations. Diversion contrary to law is prohibited.    820 872 8325



# RECEIVED

## MAY 01 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
            DEPUTY CLERK

This envelope is for use with the following services:

Do not use this envelope for:

UPS Ne
UPS Wo
UPS 2n
UPS Wo

UPS Gro
UPS Sta
UPS 3 D

```
CLERK, US DISTRICT CLERK
200 E WALL ST
STE 222
MIDLAND TX 78701

P. FIED
DTWN - 3085          S. SOUTH    I:R1
1Z0V19E0130084
1489                              233
```



